IN THE SUPREME COURT OF THE STATE OF KANSAS

Nos. 124,378
125,084

LEAGUE OF WOMEN VOTERS OF KANSAS, LOUD LIGHT,
KANSAS APPLESEED CENTER FOR LAW AND JUSTICE, INC., and
TOPEKA INDEPENDENT LIVING RESOURCE CENTER,
*Appellants*,

v.

SCOTT SCHWAB, in His Official Capacity as Kansas Secretary of State, and
KRIS W. KOBACH, in His Official Capacity as Kansas Attorney General,
*Appellees*.

SYLLABUS BY THE COURT

1.

The scope of K.S.A. 25-2438(a) extends to protected speech because its prohibitions extend to speech that is not fraudulent or deceptive.

2.

The "right to vote" is not an unenumerated natural right protected by section 1 of the Kansas Constitution Bill of Rights.

3.

Section 2 of the Kansas Constitution Bill of Rights declares the foundational political principle of delegated power from the people to their free government. This principle informs the entire edifice of law-making in a free society.

1

**4.**

The Constitution itself is the originating act of delegation of power from the people to their free government. And the Constitution makes provision for ongoing, perpetual secondary acts of delegation. The Constitution creates the *offices* of free governments—that is the seats of delegated power, largely contained in the three great departments of the executive, legislative, and judicial branches. And it provides mechanisms by which the people continue to delegate their power to *officers* who will, for a time, occupy the constitutional offices.

**5.**

The Kansas Constitution contemplates achieving section 2's ongoing and perpetual delegation of power through varied mechanisms, including popular elections, limited elections, appointments, and succession.

**6.**

Section 2 of the Kansas Constitution Bill of Rights does not address itself to these mechanisms of delegation. To find the controlling law of popular elections, we must look instead to the specific provisions in articles 4 and 5 of the Kansas Constitution.

**7.**

The right to suffrage is an enumerated political right protected by article 5 of the Kansas Constitution. As an expressly enumerated right, article 5 provides the strongest possible constitutional protections.

**8.**

The Legislature violates the Kansas Constitution's article 5 right to suffrage—meaning a right to be a qualified elector in any election called by the state or its political subdivisions—if it imposes any extra-constitutional qualifications to the precisely defined right to suffrage.

2

9.

Article 5 of the Kansas Constitution requires the Legislature to pass such laws as may be necessary for ascertaining, by proper proofs, the citizens who shall be entitled to the right of suffrage. The "proper proofs" contemplated by article 5, section 4 may include any reasonable provision for ascertaining who is entitled to vote—that is, who is a qualified elector under article 5.

10.

To prevail on a claim that the article 5 right to suffrage under the Kansas Constitution has been violated, a plaintiff must show that the Legislature has imposed what amounts to a new, extra-constitutional qualification on the right to be an elector. If a law violates the article 5 right to suffrage, it is unconstitutional.

11.

Simply because a law does not violate article 5 of the Kansas Constitution does not mean that any regime of proper proofs is permissible. In designing a process of providing proper proofs, the Legislature still must comply with other constitutional guarantees such as those of equal protection and due process.

12.

To comply with due process, any proper proofs devised by the Legislature must include reasonable notice to the voter and an opportunity to contest the disqualification of otherwise valid absentee ballots and to cure deficiencies.

13.

To comply with equal protection, any proper proofs devised by the Legislature must be capable of being applied with reasonable uniformity upon objective standards.

3

14.

K.S.A. 2023 Supp. 25-2437's limitation on the number of advanced ballots that may be delivered by one person can in no way be characterized as an added qualification on the right to be an elector.

15.

Restrictions on the number of advance ballots one person may deliver does not, in isolation, inhibit speech because delivering ballots is not speech or expressive conduct.

Review of the judgment of the Court of Appeals in 63 Kan. App. 2d 187, 525 P.3d 803 (2023). Appeal from Shawnee District Court; TERESA L. WATSON, judge. Oral argument held February 20, 2024. Opinion filed May 31, 2024. Judgment of the Court of Appeals reversing the district court is affirmed in part and reversed in part. Judgment of the district court is affirmed in part and reversed in part, and the case is remanded with directions.

*Elisabeth C. Frost*, pro hac vice, of Elias Law Group LLP, of Washington, D.C., argued the cause, and *Henry J. Brewster*, pro hac vice, *Tyler L. Bishop*, pro hac vice, *Justin Baxenberg*, pro hac vice, *Mollie A. DiBrell*, pro hac vice, *Richard A. Medina*, pro hac vice, *Marisa A. O'Gara*, pro hac vice, and *Spencer M. McCandless*, pro hac vice, of the same firm, *David Anstaett*, pro hac vice, of Perkins Coie LLP, of Madison, Wisconsin, and *Pedro L. Irigonegaray*, *Jason Zavadil*, *Nicole Revenaugh*, and *J. Bo Turney*, of Irigonegaray, Turney & Revenaugh LLP, of Topeka, were with her on the briefs for appellants.

*Bradley J. Schlozman*, of Hinkle Law Firm LLC, of Wichita, argued the cause, and *Scott R. Schillings*, of the same firm, *Brant M. Laue*, former solicitor general, *Anthony J. Powell*, solicitor general, *Derek Schmidt*, former attorney general, and *Kris W. Kobach*, attorney general, were with him on the briefs for appellees.

*Jeffrey M. Kuhlman*, of Watkins Calcara, Chtd., of Great Bend, and *Eric W. Lee*, pro hac vice, of Judicial Watch, Inc., of Washington, D.C., were on the brief for amici curiae Judicial Watch, Inc., and Allied Educational Foundation.

*Edward D. Greim*, of Graves Garrett LLC, of Kansas City, Missouri, and *Cameron T. Norris*, pro hac vice, and *Conor D. Woodfin*, pro hac vice, of Consovoy McCarthy PLLC, of Arlington, Virginia, and *Tyler R. Green*, pro hac vice, of the same firm, of Salt Lake City, Utah, were on the brief for amicus curiae Honest Elections Project.

*Sharon Brett* and *Karen Leve*, of ACLU Foundation of Kansas, of Overland Park, were on the brief for amicus curiae American Civil Liberties Union of Kansas.

*Ryan A. Kriegshauser*, of Kriegshauser Ney Law Group, of Olathe, and *Kaylan Phillips*, pro hac vice, of Public Interest Legal Foundation, Inc., of Alexandria, Virginia, were on the brief for amicus curiae Public Interest Legal Foundation, Inc.

*T. Chet Compton*, of Fleeson, Gooing, Coulson & Kitch, L.L.C., of Wichita, and *Bradley A. Benbrook*, pro hac vice, and *Stephen M. Duvernay*, pro hac vice, of Benbrook Law Group, PC, of Sacramento, California, were on the brief for amicus curiae Lawyers Democracy Fund.

*George Lewis*, of Graves Garrett LLC, of Kansas City, Missouri, and *Emmett E. Robinson*, pro hac vice, of Robinson Law Firm LLC, of Cleveland, Ohio, were on the brief for amicus curiae Restoring Integrity and Trust in Elections.

*Barry R. Grissom*, of Grissom Miller Law Firm, LLC, of Kansas City, Missouri, and *Derek S. Clinger*, pro hac vice, of State Democracy Initiative at the University of Wisconsin Law School, of Madison, Wisconsin, were on the brief for amicus curiae Richard E. Levy and Stephen R. McAllister.

The opinion of the court was delivered by

STEGALL, J.: In 2021, several voting advocacy organizations and individuals filed suit against three new Kansas election laws alleging those laws violate various provisions of the Kansas Constitution. The laws at issue prohibit the false representation of an election official; prohibit election officials from counting advance ballots that do not have a signature or have a signature that an election official determines does not match the signature on file; and prohibit any person from collecting and returning more than 10

5

advance ballots for other voters. The ensuing litigation resulted in multiple appeals, which have now been consolidated. Though consolidated, this appeal now includes two distinct procedural postures. The false representation provision is postured at the temporary injunction stage, while the other two laws are postured at the motion to dismiss stage. We recite the precise procedural history at greater length below.

Today, we hold the plaintiffs have met their burden to demonstrate a likelihood of prevailing on the merits of their claim that the false representation statute is constitutionally infirm. Therefore, the district court erred in denying their request for a temporary injunction. We reverse and remand this claim to the district court to consider the remaining temporary injunction factors.

We also hold that the signature verification requirement is a valid effort by the Legislature to provide "proper proofs" of the right to be a qualified elector, which is permissible under this court's precedent. But we remand to the district court to consider whether the statute and its implementing regulations comply with the constitutional guarantees of equal protection and due process.

Finally, we affirm the district court's grant of defendants' motion to dismiss on the claim that the ballot collection restriction is constitutionally infirm, because the restriction is not a new qualification on the right to be an elector, and because the proscribed activity—the delivery of ballots—is not political speech or expressive conduct.

FACTS AND PROCEDURAL BACKGROUND

In 2021, the Kansas Legislature passed Senate Substitute for House Bill 2183 over the governor's veto. The bill created three election laws, commonly referred to in this

6

case as the "false representation provision," the "signature verification requirement," and the "ballot collection restriction."

The plaintiffs challenged two subsections of the false representation provision, which criminalizes

> "knowingly engaging in any of the following conduct by phone, mail, email, website or other online activity or by any other means of communication while not holding a position as an election official:
>
> . . . .
>
> (2) engaging in conduct that gives the appearance of being an election official; or
>
> (3) engaging in conduct that would cause another person to believe a person engaging in such conduct is an election official." K.S.A. 25-2438(a).

The plaintiffs do not challenge subsection (1), which criminalizes "[r]epresenting oneself as an election official." K.S.A. 25-2438(a)(1).

The signature verification requirement prohibits election officers from counting advance ballots that do not have a signature or that have a signature that does not match the signature on file unless the voter corrects the deficiency. It requires the election officer to attempt to contact the voter to allow the voter an opportunity to cure the defect, and it makes an exception for voters with a disability. It provides:

> "(b) The county election officer shall attempt to contact each person who submits an advance voting ballot where there is no signature or where the signature does not match with the signature on file and allow such voter the opportunity to correct the deficiency before the commencement of the final county canvass.

. . . .

"(h) Subject to the provisions of subsection (b), no county election officer shall accept an advance voting ballot transmitted by mail unless the county election officer verifies that the signature of the person on the advance voting ballot envelope matches the signature on file in the county voter registration records, except that verification of the voter's signature shall not be required if a voter has a disability preventing the voter from signing the ballot or preventing the voter from having a signature consistent with such voter's registration form. Signature verification may occur by electronic device or by human inspection. In the event that the signature of a person on the advance voting ballot envelope does not match the signature on file in the county voter registration records, the ballot shall not be counted." K.S.A. 25-1124.

The ballot collection provision criminalizes the delivery of more than 10 advance ballots on behalf of other voters. It provides:

"(a) No person shall knowingly transmit or deliver an advance voting ballot to the county election officer or polling place on behalf of a voter who is not such person, unless the person submits a written statement accompanying the ballot at the time of ballot delivery to the county election officer or polling place as provided in this section. Any written statement shall be transmitted or signed by both the voter and the person transmitting or delivering such ballot and shall be delivered only by such person. The statement shall be on a form prescribed by the secretary of state and shall contain:

(1) A sworn statement from the person transmitting or delivering such ballot affirming that such person has not:

(A) Exercised undue influence on the voting decision of the voter; or

(B) transmitted or delivered more than 10 advance voting ballots on behalf of other persons during the election in which the ballot is being cast; and

(2) a sworn statement by the voter affirming that:

8

(A) The voter has authorized such person to transmit or deliver the voter's ballot to a county election officer or polling place; and

(B) such person has not exercised undue influence on the voting decision of the voter.

"(b) No candidate for office shall knowingly transmit or deliver an advance voting ballot to the county election officer or polling place on behalf of a voter who is not such person, except on behalf of an immediate family member of such candidate.

"(c) No person shall transmit or deliver more than 10 advance voting ballots on behalf of other voters during an election.

"(d)(1) A violation of subsection (a) or (b) is a severity level 9, nonperson felony.

(2) A violation of subsection (c) is a class B misdemeanor." K.S.A. 2021 Supp. 25-2437.

In June 2021, the plaintiffs in this case filed a lawsuit in Shawnee County District Court challenging these laws under multiple sections of the Kansas Constitution. The plaintiffs are The League of Women Voters of Kansas, Loud Light, Kansas Appleseed Center for Law and Justice, Inc., Topeka Independent Living Resource Center, Charley Crabtree, Faye Huelsmann, and Patricia Lewter. The defendants include Scott Schwab as Secretary of State and Derek Schmidt as the Kansas Attorney General, now Kris Kobach as the Attorney General. Collectively and for ease of use, we will refer to the plaintiffs from here on out as "the League" and to the defendants as "the State."

The League made the following three claims:

(1) The false representation provision violates the right to free speech and association under the Kansas Constitution Bill of Rights sections 3 and 11; is overbroad; and is vague.

(2) The signature verification requirement violates the right to vote under the Kansas Constitution Bill of Rights sections 1 and 2 and the Kansas Constitution article 5, section 1; the right to equal protection under the Kansas Constitution Bill of Rights sections 1 and 2; and the right to procedural due process under the Kansas Constitution Bill of Rights section 18.

(3) The ballot collection restriction violates the right to vote under sections 1 and 2 of the Kansas Constitution Bill of Rights and article 5, section 1 of the Kansas Constitution; and the right to free speech and association under the Kansas Constitution Bill of Rights sections 3 and 11.

The League sought declaratory relief holding the statutes unconstitutional and requested costs and attorney fees. This appeal is complicated by its tangled procedural journey through both the district court and our intermediate appellate court. The parties filed competing motions below and different rulings made by the district court were appealed at different times. It is important to have a concise and clear recitation of each step along this path, which we now provide.

- With its petition, the League moved for a partial temporary injunction prohibiting the State from enforcing the false representation provision.

- The State then filed a motion to dismiss the League's petition in its entirety for failure to state a claim.

10

- In September 2021, the district court denied the League's request for a temporary injunction against the false representation provision after concluding the League had not demonstrated a substantial likelihood of prevailing on the merits of their claims.

- The League immediately appealed this ruling. We will refer to this appellate proceeding as *League I*.

- On April 7, 2022, the League filed a motion for a partial temporary injunction prohibiting the State from enforcing the signature verification requirement.

- On April 11, 2022, the district court granted the State's motion to dismiss the signature verification claims and the ballot collection claims in their entirety. It ruled it lacked jurisdiction to consider the motion to dismiss the false representation provision because, at that time, the denial of the temporary injunction against that legislation was still pending before the Court of Appeals.

- The district court also held that its ruling mooted the League's motion for a partial temporary injunction against the signature verification requirement.

- As before, the League immediately appealed the dismissal of these claims. We will refer to this appellate proceeding as *League II*.

- The State moved to dismiss *League II* for lack of jurisdiction, arguing there was no final judgment to appeal because the district court had yet to

11

consider the merits of the motion to dismiss the false representation provision. The Court of Appeals denied the motion and retained the appeal.

- Around this time a separate Court of Appeals panel was considering the appeal in *League I*. In June 2022, a majority of that panel concluded the League lacked standing to challenge the false representation provision and dismissed the appeal. *League of Women Voters of Kansas v. Schwab*, 62 Kan. App. 2d 310, 331, 513 P.3d 1222 (2022) (*League I*). We granted the League's petition for review of that decision.

- Then in March of 2023, another Court of Appeals panel considering *League II* reversed the district court's order dismissing the League's petition with respect to the claims against the signature verification requirement and the ballot collection restriction. *League of Women Voters of Kansas v. Schwab*, 63 Kan. App. 2d 187, 224, 525 P.3d 803 (2023) (*League II*). The panel held the League had stated a claim for relief that the signature verification requirement violates the rights to vote, to procedural due process, and to equal protection under the Kansas Constitution; and that the ballot collection restriction violates the rights to vote and the right to free speech under the Kansas Constitution. It further ruled that the motion for temporary injunction against the signature verification requirement was not moot and the district court erred in dismissing it. The panel remanded the case for further proceedings.

- The State immediately petitioned for this court's review, which we granted. On June 27, 2023, the League moved for an order enjoining enforcement of the signature verification requirement and ballot collection restriction pending appeal. We denied the motion on July 28, 2023.

- On December 15, 2023, we overruled the panel's holding in *League I*, 62
  Kan. App. 2d at 331, that the League lacked standing to challenge the false
  representation provision and we remanded the case to the Court of Appeals
  for further proceedings. *League of Women Voters of Kansas v. Schwab*, 317
  Kan. 805, 821, 539 P.3d 1022 (2023). We then transferred the case back to
  this court and ordered the parties to show cause why we should not
  consolidate *League I* with *League II*. Receiving no objections, we
  consolidated the two cases.

ANALYSIS

In *League II*, the State had argued there was no appellate jurisdiction because the
partial grant of the State's motion to dismiss was not a final order—given that the false
representation claims were still pending. The panel disagreed, holding that jurisdiction
was appropriate under K.S.A. 2021 Supp. 60-2102(a)(3) which grants appellate
jurisdiction over "an order involving . . . the constitution of this state." *League II*, 63 Kan.
App. 2d at 196. The State did not petition for review of that holding. And we agree with
the panel's conclusion that appellate jurisdiction is proper under K.S.A. 2023 Supp. 60-
2102(a)(3). See also Kan. Const. art. 3, § 3 (Kansas Supreme Court "shall have . . . such
appellate jurisdiction as may be provided by law.").

*False Representation Provision*

The League attacks K.S.A. 25-2438(a)(2) and (a)(3) as a violation of the right to
free speech protected by section 11 of the Kansas Constitution Bill of Rights on three
grounds—as a facial violation; as overbroad; and as vague. The district court considered
each of these claims in ruling against the League's motion for a temporary injunction. As
set forth below, because we resolve the League's appeal on this issue exclusively on
overbreadth grounds, we need not address the League's claimed facial violation or

13

vagueness challenge. The League also previously included a claim that the law also violated the right to association protected in section 3, but they have waived that claim by focusing in briefing and argument exclusively on the speech right, which lies solely in section 11. *Russell v. May*, 306 Kan. 1058, 1089, 400 P.3d 647 (2017) (issues not adequately briefed are deemed waived or abandoned).

Section 11 of the Kansas Constitution Bill of Rights provides:

"The liberty of the press shall be inviolate; and all persons may freely speak, write or publish their sentiments on all subjects, being responsible for the abuse of such rights; and in all civil or criminal actions for libel, the truth may be given in evidence to the jury, and if it shall appear that the alleged libelous matter was published for justifiable ends, the accused party shall be acquitted."

In our decision on standing, we noted that it was unnecessary for us to consider the League's argument that the Kansas Constitution provides broader speech protections than does the First Amendment to the United States Constitution. This was so because even under traditional First Amendment jurisprudence, the League had demonstrated standing to challenge the law. *Schwab*, 317 Kan. at 815. This remains true now that we are properly postured to consider the merits because we resolve the League's claim under existing First Amendment overbreadth precedent. Therefore, we need only note that the speech protections afforded by section 11 are, at a minimum, coextensive with the First Amendment. Thus, we will not consider in this case whether section 11 provides additional speech protections.

Under the First Amendment overbreadth doctrine, "[i]f the challenger demonstrates that the statute 'prohibits a substantial amount of protected speech' relative to its 'plainly legitimate sweep,' then society's interest in free expression outweighs its interest in the statute's lawful applications, and a court will hold the law facially invalid." *United States v. Hansen*, 599 U.S. 762, 770, 143 S. Ct. 1932, 216 L. Ed. 2d 692 (2023).

14

As we recently explained in an unrelated overbreadth challenge:

"First, we interpret the language of the challenged law to determine its scope. See *United States v. Williams*, 553 U.S. 285, 293, 128 S. Ct. 1830, 170 L. Ed. 2d 650 (2008) ('The first step in overbreadth analysis is to construe the challenged statute; it is impossible to determine whether a statute reaches too far without first knowing what the statute covers.'). If the scope of the law extends to prohibit protected activity, we next decide whether the law prohibits a substantial amount of protected activity judged in relation to the law's plainly legitimate sweep. *Williams*, 299 Kan. at 920; see also *Williams*, 553 U.S. at 297; *Ferber*, 458 U.S. at 771 (recognizing the substantiality requirement applies not just to conduct, but equally to overbreadth challenges involving pure speech and speech-related conduct). Finally, if we find substantial overbreadth, we look to see whether there is a satisfactory method of severing the law's constitutional provisions from its unconstitutional provisions. *Trotter*, 316 Kan. at 320-21." *City of Wichita v. Griffie*, 318 Kan. 510, 522-23, 544 P.3d 776 (2024).

Because the lower court's consideration of the League's overbreadth challenge occurred in the context of a motion for a temporary injunction, we must also take into account our standard of review over such rulings. When a party alleges a district court erred in ruling on a motion for a temporary injunction, appellate courts review the decision for an abuse of discretion. *Downtown Bar and Grill v. State*, 294 Kan. 188, 191, 273 P.3d 709 (2012). A district court abuses its discretion if its decision is (1) arbitrary, fanciful, or unreasonable; (2) based on an error of law; or (3) based on an error of fact. *State v. Campbell*, 317 Kan. 511, 529, 532 P.3d 425 (2023). When legal questions of constitutional and statutory interpretation arise, our review is plenary. *State v. Dunn*, 304 Kan. 773, 819, 375 P.3d 332 (2016).

We focus our analysis of the lower court's decision on the second factor—did the district court commit an error of law? The League maintains that K.S.A. 25-2438(a)(2) and (3) criminalize speech regardless of whether the speaker is intending to impersonate

15

an election official. The State disagrees, arguing that the statute sweeps only unprotected impersonation into its net. The State relies on the "knowingly" language in the statute, arguing that this language limits the statute's reach to actions "*designed* to convey the false impression" the actor is an election official. (Emphasis added.) If the district court properly interpreted the statute to *only* regulate unprotected speech, its decision on the temporary injunction motion was not an abuse of discretion. If, however, the statute extends to speech protected by the First Amendment, then the lower court erred as a matter of law which amounts to an abuse of discretion under our well entrenched standard of review.

The lower courts accepted the State's interpretation of the statute. The district court ruled that (a)(2) and (3) criminalize claiming "through knowing conduct, to be something one is not" or making "knowing false representations." Based on this interpretation, it held that the provisions do not implicate protected speech activity because "falsely representing that one is speaking on behalf of the government or impersonating a government officer is not protected conduct."

In *League I*, the Court of Appeals did not rule on the district court's decision that the League was unlikely to prevail because the panel majority concluded the League lacked standing to challenge the law. But in the process, the panel interpreted the challenged provisions in a similar way, reading it to criminalize only "nefarious or deceptive" conduct. *League I*, 62 Kan. App. 2d at 321-22. In this way, both lower courts read into the statute an intent to deceive or misrepresent.

On review, we disagreed. To resolve the standing question, we were required to decide whether the League had a credible fear of prosecution. We thus provided a definitive interpretation of the statute, including whether the law contained an implicit "reasonable listener" standard that might have limited its reach to only intentional

misrepresentation activities. We concluded, on the plain language of the statute, that it does not:

> "The actus reus of the two challenged subsections—that is, the verbs—are to 'give[ ] [an] appearance' and to 'cause [a] person to believe.' The necessarily subjective and interpretive process inherent in these verbs are what disturb the nonprofits and allegedly chill their constitutionally protected activities. The State (and the lower courts) contend that the mens rea of 'knowingly' in K.S.A. 25-2438(a) effectively side-steps the innocent listener mistake.

> "But again, the nonprofits are not consoled. They argue persuasively that based on their experience, they 'know' that a certain percentage of the people they encounter will make the innocent listener mistake. . . . And they ask, how can the known possibility of an innocent or unreasonable listener mistake alter the fundamental nature of the speech from protected to unprotected? Put another way, can a listener's mistake—whether innocent or in fact entirely unreasonable—turn otherwise honest speech into fraud?

> "The answer must be no. But why? Because, in this context, in order to fall outside constitutional protections, the speech at issue must be deceptive, fraudulent, or otherwise false, at its heart. [Citations omitted.]" *Schwab*, 317 Kan. at 817-18.

We ultimately held that "when the Legislature criminalizes speech and does not—within the elements and definitions of the crime—provide a high degree of specificity and clarity demonstrating that the only speech being criminalized is constitutionally unprotected speech, the law is sufficiently unclear to confer pre-enforcement standing on a plaintiff challenging the law." 317 Kan. at 821.

Now on the merits, the State continues to argue the statute restricts only unprotected speech—that is, intentional misrepresentations and deceptive behavior. The First Amendment prohibits the government from restricting protected speech unless it does so within constitutional boundaries. In *Schwab*, we observed that content-based

17

speech is constitutionally protected "unless the speech at issue falls within a narrowly defined category of constitutionally unprotected speech." 317 Kan. at 815; see also *Reed v. Town of Gilbert*, 576 U.S. 155, 172, 135 S. Ct. 2218, 192 L. Ed. 2d 236 (2015) (when the government regulates content-based speech, the regulation is subject to strict scrutiny).

Restrictions on unprotected speech, however, do not trigger First Amendment guarantees. See *New York v. Ferber*, 458 U.S. 747, 764, 102 S. Ct. 3348, 73 L. Ed. 2d 1113 (1982). Such unprotected speech "may be freely restricted by the state so long as the regulations fall within the scope of its police power." *Schwab*, 317 Kan. at 815. Unprotected categories of speech include fraud, obscenity, defamation, incitement, speech integral to criminal conduct, fighting words, true threats, speech presenting some grave and imminent threat the government has the power to prevent, and child pornography. 317 Kan. at 815-16.

We said that "[t]he parties do not dispute that K.S.A. 25-2438(a) is a content-based restriction that *attempts* to prohibit a type of fraud—which as a historically recognized category of unprotected speech, the government may legitimately restrict without running afoul of the First Amendment." 317 Kan. at 817. To clarify, the "type of fraud" at issue here is the impersonation of an election official.

As an aside, we emphasize that for purposes of this decision, we have assumed without deciding that the impersonation of a public official is, in fact, unprotected speech. See *United States v. Chappell*, 691 F.3d 388, 395 (4th Cir. 2012) (statute prohibiting impersonation of police prohibited "a species of identity theft in which there is little or no communicative value," and was "far from significantly compromising 'recognized First Amendment protections'"); *Commonwealth v. Crawford*, 254 A.3d 769, 779 (Pa. Super. Ct. 2021) (finding that the prohibited conduct in a law criminalizing impersonation of a veteran for profit was unprotected as a form of fraud). As will be demonstrated, our

18

interpretation of the false representation provision relieves us of the need to explicitly decide that question.

We then zeroed in on the heart of the parties' dispute—which was strictly a matter of statutory interpretation. And we characterized that dispute as whether "the plain language of the statute actually does" criminalize only the impersonation of an election official. *Schwab*, 317 Kan. at 817. As always, we look first to the plain language of the statute to determine whether it restricts only unprotected speech—as the State claims—or whether it extends to speech protected by the First Amendment. *State v. Toliver*, 306 Kan. 146, 150, 392 P.3d 119 (2017) ("When the statutory language is plain and unambiguous, an appellate court simply interprets the language as it appears, without speculating and without reading into the statute language not readily found there.").

As before, we discern from the plain language used by the Legislature that it included no intent to misrepresent or deceive requirement in the statute. As such, it sweeps up protected speech in its net. That is, the League is correct that the law criminalizes honest speech which is "known" to cause occasional misunderstandings or misperceptions on the part of the listener. This is even more evident when one considers K.S.A. 21-5202(i), which provides "[a] person acts 'knowingly' . . . with respect to a result of such person's conduct when such person is aware that such person's conduct is reasonably certain to cause the result." And the League already knows its past innocent acts have caused people to mistakenly believe that League personnel are election officials despite the League's efforts to avoid that confusion. The district court thus erred and its faulty statutory interpretation infected each portion of its free speech analysis, and we conclude that it abused its discretion by making an error of law when it denied the League's motion for a temporary injunction.

To obtain a temporary injunction, a movant must establish (1) a substantial likelihood of eventually prevailing on the merits; (2) a reasonable probability exists that

the plaintiff will suffer irreparable injury without an injunction; (3) the plaintiff lacks an adequate legal remedy, such as damages; (4) the threat of injury to the plaintiff outweighs whatever harm the injunction may cause the opposing party; and (5) the injunction will not be against the public interest. *Downtown Bar and Grill*, 294 Kan. at 191. The district court stopped its analysis at the first step.

We now turn to consider whether the League has satisfied the first prong of the temporary injunction test by showing a substantial likelihood of prevailing on the merits of their overbreadth challenge. To determine whether a law is overbroad, we apply the three-step facial overbreadth standard as recently articulated in *Griffie*. At the first step, we have already held the scope of K.S.A. 25-2438(a) extends to protected speech that is not fraudulent or deceptive. The League is rightfully concerned with potential innocent and unreasonable listener mistakes and has provided evidence and well pled facts—which at this stage, we accept as true—that show those instances do occur and are not altogether uncommon.

We therefore find the amount of protected activity that is reached by K.S.A. 25-2438(a)(2) and (3) could be substantial in relation to the statute's goal of prohibiting impersonation of an election official. See *Ashcroft v. Free Speech Coalition*, 535 U.S. 234, 255, 122 S. Ct. 1389, 152 L. Ed. 2d 403 (2002) ("The Government may not suppress lawful speech as the means to suppress unlawful speech. Protected speech does not become unprotected merely because it resembles the latter. The Constitution requires the reverse."). As such, we find the League has demonstrated a substantial likelihood of eventually prevailing on the merits. A severance analysis is not required in this instance because the League has only challenged subsections (2) and (3). Subsection (1) is not properly before us in this action.

Because the district court concluded the League failed to establish a substantial likelihood of eventually prevailing on the merits, it did not address the remaining prongs

of the temporary injunction analysis. Because we find the League has made a sufficient showing at the first step, we reverse and remand for the district court to make necessary factual findings in order to consider and rule on the remaining four prongs of the temporary injunction test.

*Signature Verification Requirement*

In their petition, the League argues the signature verification requirement and the ballot collection restriction infringe on what they style the "right to vote" which they claim is protected by sections 1 and 2 of the Kansas Constitution Bill of Rights and article 5, section 1 of the Kansas Constitution. The League asserted that, because the "right to vote" is a fundamental right, the government must show the infringement withstands strict scrutiny and that the State could not sustain that burden. The district court disagreed and dismissed the petition for failure to state a claim upon which it could grant relief.

In *League II*, the Court of Appeals reversed the district court. It ruled the lower court erred in applying a federal standard to a claim that state action violated the Kansas Constitution's protections on the "right to vote." Citing *Hodes & Nauser, MDs v. Schmidt*, 309 Kan. 610, 663, 440 P.3d 461 (2019), it held that voting under the Kansas Constitution is a fundamental right and, consequently, any impairment of that right should be subject to strict scrutiny. It ruled that, under this test, the League had properly stated a claim for relief. *League II*, 63 Kan. App. 2d at 204-13.

We exercise unlimited review when evaluating whether a district court erred by granting a motion to dismiss for failure to state a claim. *Jayhawk Racing Properties v. City of Topeka*, 313 Kan. 149, 154, 484 P.3d 250 (2021). We assume the League's well-pleaded facts and allegations to be true and view them in a light most favorable to the plaintiffs. *Kudlacik v. Johnny's Shawnee, Inc.*, 309 Kan. 788, 790, 440 P.3d 576 (2019).

21

Stated another way, at the motion to dismiss stage, we ask: If everything the plaintiffs have pled is true, are they entitled to relief? If yes, a motion to dismiss should not be granted.

We begin our discussion by clarifying that the "right to vote" is not an unenumerated "natural right" protected by section 1 of the Kansas Constitution Bill of Rights. Rather, suffrage is universally understood as a political right. See, e.g., *Purcell v. Gonzalez*, 549 U.S. 1, 4, 127 S. Ct. 5, 166 L. Ed. 2d 1 (2006) (right to vote is a political right); *Reynolds v. Sims*, 377 U.S. 533, 562, 84 S. Ct. 1362, 12 L. Ed. 2d 506 (1964) ("[S]ince the right to exercise the franchise in a free and unimpaired manner is preservative of other basic civil and political rights, any alleged infringement of the right of citizens to vote must be carefully and meticulously scrutinized."); *Yick Wo v. Hopkins*, 118 U.S. 356, 370, 6 S. Ct. 1064, 30 L. Ed. 220 (1886) (right to vote "not regarded strictly as a natural right, but as a privilege merely conceded by society, according to its will, under certain conditions, nevertheless it is regarded as a fundamental political right, because preservative of all rights"); *Moore v. Shanahan*, 207 Kan. 645, 649, 486 P.2d 506 (1971) ("The right to vote in any election is a personal and individual right, to be exercised in a free and unimpaired manner, in accordance with our Constitution and laws. The right is pervasive of other basic civil and political rights, and is the bed-rock of our free political system."); *Hammond v. Brinkman*, 173 Kan. 406, 408, 246 P.2d 345 (1952) (noting "'political rights'" include the right to vote); *State ex rel. Parker v. Corcoran*, 155 Kan. 714, 721, 128 P.2d 999 (1942) (same); *Wheeler v. Brady*, 15 Kan. 26, 33, 1875 WL 763 (1875) (recognizing that women possess the same political right to vote in school district elections as men). Given this, the Court of Appeals erred when it analyzed the question under our existing section 1 jurisprudence.

Turning to section 2 of the Kansas Constitution Bill of Rights, it provides in full:

22

"All political power is inherent in the people, and all free governments are founded on their authority, and are instituted for their equal protection and benefit. No special privileges or immunities shall ever be granted by the legislature, which may not be altered, revoked or repealed by the same body; and this power shall be exercised by no other tribunal or agency."

We agree with Justice Rosen's dissent that section 2 states clearly one of our most cherished principles of government—"[a]ll political power" comes from "the people," and through that power, the people have "instituted" "free government[]" for the people's "equal protection and benefit." Kan. Const. Bill of Rights, § 2; slip op. at 43 (Rosen, J., concurring in part and dissenting in part). This states one of the most foundational political ideas of our democratic system, and it informs the entire edifice of law-making in a free society. Over 150 years ago, we elucidated the principle this way:

"In this country it is universally acknowledged and insisted upon, that the people are the original source and fountain of all civil and political power; that neither the whole government, nor any department thereof, possesses any inherent power; that the people are sovereign, and the different departments of the government are simply agencies, through which the people exercise that sovereignty; and that all the power that can be exercised by any department of the government is merely delegated power which it derives from the people. The State government derives its powers from the people solely by virtue of the State Constitution. This constitution is the letter of attorney or chart of authority from the people to the government and to the different departments thereof. Hence, in order to ascertain what power is delegated to the government, and to each of its departments, we must look to the constitution itself." *Coleman v. Newby*, 7 Kan. 82, 86, 1871 WL 696 (1871).

At the heart of section 2, then, is the notion of *delegated* power. But how, precisely, is such power transferred—or delegated—from the people to a free government? On this question, section 2 is silent. This is not an oversight or deficit of section 2's foundational statement of principle, because at the outset, the very *act* of

23

"constituting" a state is self-evidently the *mechanism* by which free governments obtain delegated power. In other words, it is axiomatic that free governments exercise what powers they possess as *agents* of the people, having properly received such power at "birth" through a "constituting" process of delegation. So, the initiatory "chart of authority from the people to the government" is "the constitution itself." 7 Kan. at 86.

But "the people," in constituting the state, were not blind watchmakers, content to wind a clock and simply let it run. Ours is not a self-perpetuating state—it is neither hereditary nor does it enjoy the power to select its own successors. Though such a system could be consistent with section 2's initial, constituting act of delegation, we know from the text of that initiatory act that the people intended to *continue* constituting that state, at regular intervals, through ongoing and perpetual subordinate acts of delegation. We generally call such acts of ongoing delegation "elections" and "appointments."

Elections, and the controlled and constitutionally defined process of voting that in the aggregate creates an "election," are the principle post-constitutional mechanism of delegation by which the people grant power to their representative office holders. We can thus say that while the Constitution creates the *offices* of free governments—that is the seats of delegated power, largely contained in the three great departments of the executive, legislative, and judicial branches—it is by elections that the people most regularly and persistently delegate power to *officers* who will, for a time, occupy the constitutional offices. Certain other officers receive their delegation of the people's power through a constitutionally created process of *appointment*.

Section 2 does not address itself directly to these perpetual post-constitutional acts of delegation. Rather, it simply declares that delegation for the equal protection and benefit of the people is the operating system of our free government. We must look elsewhere in the people's charter to find how, precisely, the mechanism of delegation

24

works. For this, we need not look hard, for the answer is woven throughout the people's constituting act.

It is noteworthy that the mechanisms of delegation often require voting by the populace, but not always. For example, while the Constitution provides for the election by popular vote of some public officers, it designates that other constitutional officers will be appointed, and it grants authority to the Legislature to provide for the appointment of nonconstitutional officers. Kansas Supreme Court Justices, for example, initially achieve office through an appointment system specifically set forth in article 3 of the Kansas Constitution. Yet it remains true that justices on this court also exercise power that is delegated to them from "the people." The delegation to the Legislature to designate other officers that can be appointed can be found in multiple constitutional provisions. See Kan. Const. art. 2, § 18 ("The legislature may provide for the election *or appointment* of all officers and the filling of all vacancies not otherwise provided for in this constitution." [Emphasis added.]); Kan. Const. art. 15, § 1 ("All officers whose election *or appointment* is not otherwise provided for, shall be chosen *or appointed* as may be prescribed by law." [Emphases added.]).

In the same way, some constitutional officers are delegated power through *limited* (as opposed to popular) elections. A very small electorate chooses the Senate President and the Speaker of the House. See Kan. Const. art. 2, § 8 ("Each house shall elect its presiding officer."). While a limited professional class enjoys the privilege of electing the Chairperson of the Supreme Court Nominating Commission. See Kan. Const. art. 3, § 5(e) (The chairperson shall be "chosen from among their number by the members of the bar who are residents of and licensed in Kansas."). And finally, in rare circumstances, some achieve an office through *succession* when a vacancy occurs mid-term and another office holder automatically ascends to the vacant seat. See Kan. Const. art. 1, § 11 ("When the office of governor is vacant, the lieutenant governor shall become

governor."). These are all examples of delegated power, perfectly consistent with section 2, that do not require popular elections.

Where popular elections are required—by either statute or by the Kansas Constitution in articles 1 and 2 (or elsewhere)—the mode, form, and rules governing those elections are constitutionally delegated from the people to their free government in concrete constitutional commands. See Kan. Const. art. 4, § 1 ("Mode of voting. All elections by the people shall be by ballot or voting device, or both, *as the legislature shall by law provide*." [Emphasis added.]). And, while setting forth the specific and required qualifications for all electors in the Constitution, the people empowered the Legislature to "provide by law for proper proofs of the right of suffrage." See Kan. Const. art. 5, §§ 1, 4.

The issues raised in this appeal relate to the mode of voting and proof of the right to suffrage—matters addressed in articles 4 and 5. That is, the questions before us relate directly to the "how" of delegated power—the mechanisms by which the people continue to choose office holders who will occupy the seats of delegated power—not to the very existence of delegated power as guaranteed by section 2. Thus, having understood that various mechanisms of ongoing delegation may be chosen by the people in their initial constituting act, we must look only to articles 4 and 5 to analyze issues relating to the mode of voting and to the right of suffrage (including necessary proofs of that right).

In doing so, our analysis is consistent with the widely accepted statutory interpretive principle that a specific provision controls over a more general one. See, e.g., *In re E.J.D.*, 301 Kan. 790, 794, 348 P.3d 512 (2015). This principle is at times helpful in the realm of constitutional interpretation as well, and we find it to be so in this instance. See *City of Tulsa v. Southwestern Bell Telephone Co.*, 75 F.2d 343, 351 (10th Cir. 1935) ("It is a well-settled rule of construction that where there is, in an act or Constitution, a specific provision relating to a particular subject, such provision will govern in respect to that subject as against general provisions in the act or Constitution, although the latter

26

standing alone would be broad enough to include the subject to which the more particular provision relates."); *Clouse ex rel. Clouse v. State*, 199 Ariz. 196, 199, 16 P.3d 757 (2001) ("'It is an established axiom of constitutional law that where there are both general and specific constitutional provisions relating to the same subject, the specific provision will control.'"); *State ex rel. One Person One Vote v. LaRose*, ___ N.E.3d ___, 2023 WL 4037602, at *5 (Ohio 2023) ("'[S]pecial [constitutional] provisions relating to a subject will control general provisions in which, but for such special provisions, the subject might be regarded as embraced.'") (quoting *Akron v. Roth*, 88 Ohio St. 456, 461, 103 N.E. 465 [1913]).

As we have made clear, articles 4 and 5 more specifically, concretely, and plainly concern voting rights than does the general statement of principle set forth in section 2 which does not—by its plain terms—address itself to voting. As a matter of political philosophy, the broad and foundational concept of delegated power does not necessarily even include elections. (We note that the League's equal protection claims—which do arise under section 2—are addressed at a later point in this opinion.)

Here, the parties have not discussed article 4, although some of their arguments relate to the mode of voting. But the League has asserted violations of article 5. The verification processes relating to mailed or absentee ballots have been recognized by this court as the "proofs" allowed under article 5, section 4 of the Kansas Constitution. See, e.g., *Burke v. State Board of Canvassers*, 152 Kan. 826, Syl. ¶ 6, 833, 107 P.2d 773 (1940) (statute requiring absentee voter return form affidavit with ballot verifying voter's election precinct, voter's place of residence, whether voter is duly registered, and that voter personally marked the ballot is "a valid exercise of the power conferred on the Legislature" under the constitutional provision stating that the Legislature shall pass laws necessary for "'ascertaining by proper proofs citizens who shall be entitled to the right of suffrage'"); *Lemons v. Noller*, 144 Kan. 813, 826, 63 P.2d 177 (1936) (Legislature may require absentee electors "file a written request for a ballot, the request to contain proofs

27

of his right to vote."). Thus, our focus is limited to interpreting and enforcing the specific guarantees of article 5.

We pause here to briefly address the arguments made by our colleagues in dissent. The dissenters' criticisms fall wide of the mark. While most of their vigorously asserted non sequiturs do not merit a response, we discern that two discrete points in reply may assist the reader.

First, the dissents insist we have ignored past precedent from our court holding that section 2 protects a fundamental right to vote. The caselaw does not bear this out. The dissents cannot point to anywhere in the Kansas Reports where this court held that section 2 protects a fundamental right to vote. It simply is not there. Consider the key passage from *Harris v. Shanahan* relied on by the dissenters. There, we wrote that the Kansas Constitution declares that "every qualified elector of the several counties is given the right to vote for officers that are elected by the people, and he is possessed of equal power and influence in the making of laws which govern him." 192 Kan. 183, 204, 387 P.2d 771 (1963). The *Harris* court then merely cited to section 2 as support for this statement. And of course, citizens being "possessed of equal power and influence" is properly considered part of the "equal protection" guarantees found in the second sentence of section 2. 192 Kan. at 204. Today's decision does not conflict with any of our past precedent, though we are more precise and rigorous in how we concretely describe our constitutional provisions and how they function together to guarantee and protect the people's constituting decision to form a government of limited and delegated powers.

Second, one gets the impression reading the dissents that they think of the "right to vote" in talismanic terms, as though it were a kind of superpower of citizenship, to be wielded in times of trouble whenever and wherever desired. Our view is both more realistic and practical as well as more legally and constitutionally precise. There can be no "right to vote" unless there is *first* a "right to elect." The dissents cannot

28

demonstrate—and they do not even try—that section 2 guarantees a "right to elect." Because how could it? Such a guarantee is flatly contradicted by the numerous other provisions of the Constitution (discussed above) establishing paths to political office that do not require an election. Rather, the "right to elect" is found in concrete and specific provisions of the Constitution or statutes which set forth with precision exactly which public office or constitutional amendment or ballot question is subject to election and when. It is only *after* a "right to elect" exists that certain citizens are guaranteed the "right to be an elector" under article 5 for specific elections.

But just because the right to vote is not protected in our Bill of Rights does not mean that constitutional voting guarantees are somehow weak or ineffective. Quite the contrary. The article 5 right protected by the Kansas Constitution is an *enumerated political right*. As an expressly enumerated right, article 5 provides the strongest possible constitutional protections. For 140 years this court has recognized that the Legislature violates the article 5 right—which is more precisely referred to as a "right to suffrage," meaning a right to be a qualified elector in any election called by the state or its political subdivisions—if it imposes any extra-constitutional qualifications to the precisely defined right to suffrage. *State v. Butts*, 31 Kan. 537, 555, 2 P. 618 (1884).

The panel thus erred by straying into a "fundamental rights" mode of analysis and by deciding to apply strict scrutiny under sections 1 and 2 of the Kansas Constitution Bill of Rights. Instead, determining whether the article 5 right to suffrage has been violated is subject to our test set forth in *Butts*, 31 Kan. at 554-56.

In *Butts*, the challengers claimed that a voter registration act violated the article 5 right to suffrage. That registration act required that for a person to be able to vote, they must register in person with the city clerk at the clerk's office and provide their name, age, occupation, and place of residence. It further required voters to complete their registration at least 10 days before election day. Under the act, a person who was

29

otherwise qualified, but not registered, would not be allowed to participate in the election. 31 Kan. at 551-52.

The *Butts* court found that the registration provision did not deprive any citizen of their article 5 right to suffrage but was instead a reasonable regulation under which that right may be exercised. In so deciding, the court looked to the language of article 5 itself which "requires" that the Legislature set forth by law the "'proper proofs'" necessary to ascertain "'who shall be entitled to the right of suffrage.'" 31 Kan. at 554 (quoting Kan. Const. art. 5, § 4). And if "the legislature has the right to require proof of a man's qualification, it has a right to say when such proof shall be furnished, and before what tribunal; and unless this power is abused the courts may not interfere." 31 Kan. at 555-56. The "proper proofs" contemplated by article 5 may include any *reasonable* provision for ascertaining who is entitled to vote—that is, who is a qualified elector under article 5:

> "Requiring a party to be registered, is not in any true sense imposing an additional qualification, any more than requiring a voter to go to a specific place for the purpose of voting, or requiring him to prove by his own oath or the oaths of other parties his right to vote when challenged, or than requiring a naturalized foreigner to present his naturalization papers. Each and all of these are simply matters of proof, steps to be taken in order to ascertain who are and who are not entitled to vote. . . . If the legislature has the right to require proof of a man's qualification, it has a right to say when such proof shall be furnished, and before what tribunal; and unless this power is abused the courts may not interfere." 31 Kan. at 554-56.

In other words, the test pronounced in *Butts* provides that the Legislature may validly make registration (or the provision of other "proper proofs") a prerequisite to the act of voting, but in so doing, the Legislature cannot "under the pretext of securing evidence of voters' qualifications . . . cast so much burden as really to be imposing additional qualifications" on the right to suffrage. 31 Kan. at 554. Accordingly, to prevail on a claim that the article 5 right to suffrage has been violated, a plaintiff must show that

the Legislature has imposed what amounts to a new, extra-constitutional qualification on the right to be an elector—that is, the law must be shown to unreasonably burden the right to suffrage. Such unreasonable burdens, as a matter of law, bear no reasonable relationship to the Legislature's lawful role of providing proper proofs but instead amount to extra-constitutional and de facto qualifications on the right to suffrage. If a law is shown to violate the *Butts* test—i.e., if it imposes any additional de facto qualifications not expressly set forth in article 5 on the right to become an elector—the law is unconstitutional.

This mode of review for an enumerated right differs significantly from the tiered scrutiny analysis typically used to evaluate regulations on unenumerated rights—whether they be designated "fundamental" or not. Put simply, if a law violates the article 5 right to suffrage, it is unconstitutional, full stop. See *State ex rel. Smith v. Beggs*, 126 Kan. 811, 814-15, 271 P. 400 (1928) (holding statute requiring additional qualification on voter at general election by demanding a declaration of party affiliation was invalid under Kan. Const. art. 5, § 1). Once an extra-constitutional qualification on the right to suffrage is found, courts need not permit the government an opportunity to satisfy a balancing test, even such a stringent one as strict scrutiny.

To answer this simple question—does the signature requirement impose an extra-constitutional qualification on the right of suffrage?—we must, following *Butts*, turn to article 5, section 4, which envisions that the "legislature shall provide by law for proper proofs of the right of suffrage." Kan. Const. art. 5, § 4. This provision makes clear that our framers understood reasonable regulations requiring proper proofs were not the equivalent of imposing a new qualification on the right to be an elector. So, the reasonable imposition of a proper proof—i.e., "steps to be taken in order to ascertain who and who are not entitled to vote," 31 Kan. at 554—cannot violate the article 5 right because it is not an extra-constitutional qualification. It is instead a means of establishing

31

the existing, and still necessary, qualifications. See *Burke*, 152 Kan. 826, Syl. ¶ 6; *Lemons*, 144 Kan. at 822, 824.

Ensuring that all Kansas voters are properly qualified to be electors is just as important as ensuring that no extra-constitutional qualifications are imposed. This is so because of the axiomatic reality that permitting an unqualified elector has much the same effect as prohibiting a qualified one. Each of these outcomes disenfranchises the genuine vote of someone who is qualified to vote. See 144 Kan. at 819 ("When the constitutional convention of Kansas met in 1859, its members were well aware that a determined effort was being made by the antislavery and proslavery forces to dominate the form of government of the then territory . . . . Such elections as were had were held under difficulty and each side accused the other of procuring votes from persons not entitled."). We read article 5 and *Butts* to be singularly focused on achieving the goal of ensuring that no qualified elector will have his or her vote "not count" either by *actually* not counting it, or by having its effect *diluted* by the counting of illegitimate votes.

The Kansas Constitution thus gives the Legislature authority to pass reasonable laws allowing election officials to ascertain whether a citizen possesses the qualifications required of an elector—which "includes the ability to require a potential voter to identify himself or herself in some fashion, thereby answering the question, 'Are you who you say you are, a constitutionally qualified elector?'" *League of Women Voters Educ. Network v. Walker*, 357 Wis. 2d 360, 376, 851 N.W.2d 302 (2014); see also *Capen v. Foster*, 12 Pick. 485, 492, 29 Mass. 485, 491 (1832) ("The constitution, by carefully prescribing the qualifications of voters, necessarily requires that an examination of the claims of persons to vote, on the ground of possessing these qualifications, must at some time be had by those who are to decide on them. The time and labor necessary to complete these investigations must increase in proportion to the increased number of voters; and indeed in a still greater ratio in populous commercial and manufacturing towns, in which the inhabitants are frequently changing, and where of necessity many of the qualified voters

32

are strangers to the selectmen."). Therefore, we must ask: Is the imposition of the signature requirement an impermissible new qualification on the right to be an elector which unreasonably burdens the right of suffrage or is it reasonably related to the Legislature's constitutional duty to ensure a fully qualified electorate?

The signature verification requirement prohibits election officers from counting advance ballots that do not have a signature or that have a signature that does not match the signature on file unless the voter corrects the deficiency. It requires the election officer to attempt to contact the voter first—to enable a cure—and makes an exception for voters with a disability. Kansas law includes many other "proper proof" provisions. For example, a person voting at a polling place is required to provide their name, address (if required), signature, and a valid form of identification. K.S.A. 2023 Supp. 25-2908(b). Likewise, the signature verification requirement at issue here is "simply [a] matter[] of proof—steps to be taken in order to ascertain who and who are not entitled to vote." *Butts*, 31 Kan. at 554.

It is reasonable for the Legislature to impose such proof requirements because it is important for election officials to determine whether a person is who they say they are— which again, is not an extra-constitutional elector qualification, "but rather, it is a mode of identifying those who possess constitutionally required qualifications." *Walker*, 357 Wis. 2d at 378 (upholding law requiring photo identification to vote as a valid proper proof); see also *Crawford v. Marion County Election Bd.*, 472 F.3d 949, 952-53 (7th Cir. 2007) (upholding a state law requiring photo identification to vote, in part because it helps deter voting fraud which "impairs the right of legitimate voters to vote by diluting their votes"), *aff'd* 553 U.S. 181, 128 S. Ct. 1610, 170 L. Ed. 2d 574 (2008); *Promote the Vote v. Secretary of State*, 333 Mich. App. 93, 120-24, 958 N.W.2d 861 (2020) (upholding state law requiring proof of residency to vote because requirement was not an "additional obligation" on the right to vote, but rather a proof that the person is a "qualified elector").

The League suggests there are instances when the failure of proof—a faulty signature match—disenfranchises a qualified elector. The *Butts* court recognized and addressed this practical reality:

"It is true isolated instances may occur where a party through absence or sickness is unable to register, and so loses his vote, but the same result may follow where any failure to produce the required evidence occurs. A naturalized foreigner may lose his naturalization papers, and the court where he was naturalized may be at the very extreme of the land, and so, for the lack of the legal evidence of his naturalization, he may lose his vote . . . ." *Butts*, 31 Kan. at 555.

Critically, *Butts* recognized that these are not truly disenfranchisements, but "in both cases, the matter is simply one of a lack of evidence." 31 Kan. at 555. Noting that there is no "special virtue in the mere day of election," *Butts* makes it clear that citizens wishing to exercise the right of suffrage must meet the reasonable requirements of the Legislature, and that a failure to do so does not mean that citizen has been disenfranchised. 31 Kan. at 555-56.

So here, the signature verification requirement at issue is properly categorized as a reasonable effort by the Legislature to provide "proper proofs" of the right to be a qualified elector. It does not impose a new qualification on the right to suffrage because its burdens are reasonably related to the Legislature's duty and prerogative to provide proper proofs. As such, the regulation is not an extra-constitutional "abuse" of the Legislature's authority to provide for proper proofs and in these circumstances, "courts may not interfere." 31 Kan. at 556. The district court did not err in granting the motion to dismiss the League's article 5 claim, though the district court's rationale was incorrect. See *State v. McCroy*, 313 Kan. 531, 539, 486 P.3d 618 (2021) (affirming lower court as right for the wrong reason).

Our analysis, however, cannot end here. Simply because a law does not violate article 5 does not mean that any regime of proper proofs is permissible. In designing a process of providing proper proofs, the Legislature still must comply with other constitutional guarantees such as those of equal protection and due process.

The Kansas equal protection guarantee provides that "all free governments are . . . instituted for [the people's] equal protection and benefit." Kan. Const. Bill of Rights, § 2. We are "guided by United States Supreme Court precedent interpreting and applying the equal protection guarantees of the Fourteenth Amendment of the federal Constitution when we are called upon to interpret and apply the coextensive equal protection guarantees of section 2 of the Kansas Constitution Bill of Rights." *Rivera v. Schwab*, 315 Kan. 877, 894, 512 P.3d 168 (2022).

Equal protection requires "similarly situated individuals should be treated alike." *State v. Gaudina*, 284 Kan. 354, 372, 160 P.3d 854 (2007). It "does not require that all persons receive identical treatment, but only that persons similarly situated with respect to the legitimate purpose of the law receive like treatment." 284 Kan. at 372. To comply with equal protection in the context of providing "proper proofs" of the right to be a qualified elector, any proper proofs devised by the Legislature must be capable of being applied with reasonable uniformity upon objective standards so that no voter is subject to arbitrary and disparate treatment. See *Dunn v. Blumstein*, 405 U.S. 330, 336, 92 S. Ct. 995, 31 L. Ed. 2d 274 (1972) ("In decision after decision, this Court has made clear that a citizen has a constitutionally protected right to participate in elections on an equal basis with other citizens in the jurisdiction."); *Reynolds*, 377 U.S. at 565 (equal protection requires "uniform treatment of persons standing in the same relation to the governmental action questioned or challenged"); *Harper v. Virginia Bd. of Elections*, 383 U.S. 663, 665, 86 S. Ct. 1079, 16 L. Ed. 2d 169 (1966) ("[T]he right of suffrage 'is subject to the imposition of state standards which are not discriminatory and which do not contravene any restriction that Congress, acting pursuant to its constitutional powers, has

35

imposed.'"). If the determination of proper proofs is subject to arbitrary and non-uniform standards, different citizens will be treated differently in violation of equal protection. See *Bush v. Gore*, 531 U.S. 98, 104-05, 121 S. Ct. 525, 148 L. Ed. 2d 388 (2000) (equal protection of the laws means that "[h]aving once granted the right to vote on equal terms, the State may not, by later arbitrary and disparate treatment, value one person's vote over that of another").

Moreover, any required proper proofs must also comply with due process. Section 18 of the Kansas Constitution Bill of Rights provides: "All persons, for injuries suffered in person, reputation or property, shall have remedy by due course of law, and justice administered without delay." The phrase "remedy by due course of law" is "tied to due process concerns." *In re Marriage of Soden*, 251 Kan. 225, 233, 834 P.2d 358 (1992); see also *Hanson v. Krehbiel*, 68 Kan. 670, Syl. ¶ 2, 75 P. 1041 (1904) (Section 18 provides for "due course of procedure" and "a fair hearing."). To comply with due process guarantees, any proper proofs devised by the Legislature must include reasonable notice to the voter and an opportunity to be heard at a meaningful time and in a meaningful manner by providing an opportunity to contest the disqualification of otherwise valid absentee ballots and to cure deficiencies based on an apparent discrepancy between the voters' signatures and sample signatures available to election officials. E.g., *Democracy N.C. v. N.C. State Bd. of Elec.*, 476 F. Supp. 3d 158, 228 (M.D.N.C. 2020); *League of Women Voters of South Carolina v. Andino*, 497 F. Supp. 3d 59, 69 (D.S.C. 2020); *Raetzel v. Parks/Bellemont Absentee Election Bd.*, 762 F. Supp. 1354, 1358 (D. Ariz. 1990).

Because we are at a motion to dismiss stage of the proceeding, we accept all allegations in the petition as true. *Kudlacik*, 309 Kan. at 790. The League claims that these provisions are incapable of being enforced in a manner that is not arbitrary and violative of equal protection and due process because the statute does not explicitly require training on signature matching, it does not contain any standards for determining

36

what constitutes a mismatch, and it lacks a standard for notice and the opportunity to cure defects.

The League has made a colorable claim—accepting the allegations in the petition as true—that the signature requirement is not sufficiently uniform or objective, and that the notice and cure provisions are not reasonable. See, e.g., *Minnesota Voters Alliance v. Mansky*, 585 U.S. 1, 16-17, 138 S. Ct. 1876, 201 L. Ed. 2d 201 (2018) (in a challenge to a prohibition on wearing anything "political" inside a polling place on election day, held that the State must "be able to articulate some sensible basis for distinguishing what may come in from what must stay out," and declaring the use of "unmoored" terms and "haphazard interpretations . . . in official guidance" rendered the restriction infirm).

Because we are at a motion to dismiss stage of the proceeding, we will not deny the League their full opportunity to prove up their claims as a matter of evidence in the district court. Accordingly, we reverse the district court's grant of the State's motion to dismiss on the equal protection and due process claims. The League must have an opportunity to test the signature requirement against the proper legal standard:  Does the signature requirement (and its implementing regulations and policies, such as those promulgated in K.A.R. 7-36-9, K.A.R. 7-36-7 [2023 Supp.], and K.A.R. 7-36-3) achieve reasonable uniformity on objective standards, and does it provide reasonable notice of defects and an opportunity to cure? We reverse and remand to the district court for that determination.

*Ballot Collection Restriction*

Finally, we turn to the ballot collection restriction. The League argues the ballot collection restriction infringes on the right to suffrage, the right to engage in political speech, expressive conduct, and association. As above, though the League raised a

section 3 associational claim against the ballot collection restriction in their petition, it was not briefed and is therefore deemed abandoned. *Russell*, 306 Kan. at 1089.

The League first claims that the restriction imposes an unreasonable infringement of the right to suffrage because some Kansans must vote by having another person collect and deliver their ballot. In *League II*, the Court of Appeals, applying strict scrutiny, agreed and held the League had pled facts showing the ballot collection restriction impairs the right to vote. It reasoned that because "[n]ot all voters can make a trip to the polls," the restriction is "a limitation that prevents votes from being cast and counted." *League II*, 63 Kan. App. 2d at 212.

Again, the Court of Appeals erred in applying the strict scrutiny standard to this claim. As above, the proper test to apply when a plaintiff challenges a law as infringing on the article 5 right to suffrage is the *Butts* test. Under that test, we evaluate whether the state has imposed what amounts to a new qualification on the right to be an elector. *Butts*, 31 Kan. at 554-56.

Viewing the pleadings in the light most favorable to the League, we conclude they have not pled that the ballot collection restriction amounts to a new qualification on the right to be an elector. K.S.A. 2023 Supp. 25-2437's limitation on the number of advanced ballots that may be delivered by one person can in no way be characterized as an added qualification on the right to be an elector. Rather, it is a regulation of the mechanics of an election. These matters are governed by article 4 of our Constitution, and the League has not asserted an article 4 violation. Voters have numerous avenues available to deliver their ballots. See K.S.A. 2023 Supp. 25-433 (providing instructions for mailing of ballots, including postage directions); K.S.A. 2023 Supp. 25-1122(c) (providing instructions for applying for advance voting ballot by mail). As such, we affirm the district court's grant of the State's motion to dismiss the League's article 5 claim—though as above, the decision was correct for the wrong reason.

38

Likewise, the League's speech claim against the ballot collection requirement fails because the proscribed activity—the delivery of ballots—is not speech or expressive conduct. See, e.g., *Texas v. Johnson*, 491 U.S. 397, 405, 109 S. Ct. 2533, 105 L. Ed. 2d 342 (1989) (warning that not all conduct is "expressive" for purposes of the First Amendment); *Spence v. Washington*, 418 U.S. 405, 409, 94 S. Ct. 2727, 41 L. Ed. 2d 842 (1974) (same); *United States v. O'Brien*, 391 U.S. 367, 376, 88 S. Ct. 1673, 20 L. Ed. 2d 672 (1968) ("We cannot accept the view that an apparently limitless variety of conduct can be labeled 'speech' whenever the person engaging in the conduct intends thereby to express an idea.").

Restrictions on the number of advance ballots one person may deliver does not, in isolation, inhibit speech at all; indeed, ballot deliverers are no more engaged in speech than is the postal service when it delivers packages. See, e.g., *Knox v. Brnovich*, 907 F.3d 1167, 1182 (9th Cir. 2018) (state law regulating collection of voters' early mail ballots did not implicate First Amendment right to speech); *Feldman v. Arizona Secretary of State's Office*, 843 F.3d 366, 392 (9th Cir. 2016) (collecting ballots is not expressive conduct); *Voting for America, Inc. v. Steen*, 732 F.3d 382, 391 (5th Cir. 2013) (The "receipt and delivery of completed voter-registration applications" is not expressive conduct.).

Justice Rosen's dissent relies on *Meyer v. Grant*, 486 U.S. 414, 108 S. Ct. 1886, 100 L. Ed. 2d 425 (1988), to reach the opposite conclusion. There, the United States Supreme Court struck down a Colorado ban on paying petition circulators, reasoning that those who circulate petitions for ballot initiatives are engaged in core political speech. His dissent relies on this holding and equates the actions of petition circulators with the actions of those who deliver advance ballots.

We find these two distinct acts readily distinguishable. The Colorado law at issue in *Meyer* was a "limitation on political expression" because circulation of an initiative petition itself "involves both the expression of a desire for political change and a discussion of the merits of the proposed change." 486 U.S. at 420-21. And the circulator "in almost every case" would need to explain "the nature of the proposal and why its advocates support it," which is "interactive communication concerning political change," or "'core political speech.'" 486 U.S. at 421-22.

The same cannot be said of Kansas' advance ballot delivery restriction. The restriction "does not regulate something that the Plaintiffs use to speak and thereby target or burden that speech. Unlike the ink that a party uses to create written speech, or the money or people that a party uses to create oral speech," the delivery of completed ballots "is not a speech 'input.' [Citations omitted.]" See *Lichtenstein v. Hargett*, 83 F.4th 575, 586-87 (6th Cir. 2023) (distinguishing Tennessee's ban on distributing the official state form for applying to vote absentee from the petition circulation in *Meyer* which "limited the 'direct one-on-one communication' that all agree is pure political expression"). While the League's underlying activities do qualify as protected political speech, nothing in the Kansas statute "in any way restricts [their] actual oral or written speech about" voting. 83 F.4th at 586. "Soliciting, urging and persuading the citizen to vote are the forms of the canvasser's speech, but only the voter decides to 'speak' by registering." *Voting for America, Inc. v. Steen*, 732 F.3d 382, 390 (5th Cir. 2013). Just so here—the advance ballot is the core political speech of the voter, not the League, and "'[o]ne does not "speak" in this context by handling another person's "speech."'" 732 F.3d at 390.

Nor does the ballot collection restriction "make the creation of this speech 'more costly' and thereby reduce its volume under the basic laws of supply and demand." *Lichtenstein*, 83 F.4th at 586. Rather, the ballot collection restriction only proscribes the number of completed ballots one may return—implicating merely the "administrative mechanisms through which eligible voters" return their ballot—and has no effect on the

League's political speech. See *VoteAmerica v. Raffensperger*, 609 F. Supp. 3d 1341, 1355 (N.D. Ga. 2022) (state law regulating absentee ballot applications did not involve political speech because it did not "require the type of interactive debate and advocacy that the Supreme Court found constituted core political speech in *Meyer*"). The League "may still explain their missions in full and educate voters" because the restriction "limits only non-expressive conduct." See *Priorities USA v. Nessel*, 628 F. Supp. 3d 716, 726-27 (E.D. Mich. 2022) (finding a Michigan law that restricted possession of signed absentee voter ballot applications by persons other than the applicant to extend only to non-expressive conduct, rendering First Amendment protections inapplicable). The League is not barred from engaging in speech relating to their mission—"[t]o the contrary, they can engage in those communications as often as—and in whatever form—that they desire." *Raffensperger*, 609 F. Supp. 3d at 1355.

We agree with the State that "the statute does not prevent any individual from speaking to another person, nor does it impose any content restriction on such speech" and thus "impacts neither speech nor expressive conduct." On the pled facts, we affirm the district court's grant of the State's motion to dismiss on this claim because the actual collection and return of a ballot, in isolation, is not political speech or expressive conduct.

Judgment of the Court of Appeals reversing the district court is affirmed in part and reversed in part. Judgment of the district court is affirmed in part and reversed in part, and the case is remanded with directions.

* * *

ROSEN, J., concurring in part and dissenting in part:  I write separately because, in my view, both individual determinations and broad holdings of the majority's opinion misstate the law of this state, ignore key aspects of the plaintiffs' case, and endanger the basic rights of Kansas voters to participate in the political process. Today the court

majority strips Kansans of our founders' ultimate promise that the majority will rule and that the government it empowers will answer to its calls. It staggers my imagination to conclude Kansas citizens have no fundamental right to vote under their state constitution. Admission to the United States was predicated on a constitutional guarantee of a republican form of government. Over 160 years later, this court removes that guarantee. I cannot and will not condone this betrayal of our constitutional duty to safeguard the foundational rights of Kansans.

I write separately for many reasons. First, I agree with the plaintiffs' position that section 2 of the Kansas Constitution Bill of Rights protects a right to vote and that they have set forth facts to show the signature verification requirement and the ballot collection restriction violate this protection. Second, I disagree with the majority's conclusion that the signature verification requirement is a "law for proper proofs," so it is not an additional qualification in violation of article 5, and its characterization of the requirement as such throughout its equal protection and due process analyses. Slip op. at 31; Kan. Const. art. 5, § 4. The plaintiffs have set forth facts to show this is not a law for proper proofs and it indeed imposes an additional qualification on the right to be an elector. Third, while I agree the plaintiffs failed to establish facts showing the ballot collection restriction violates article 5, the illogical analysis the majority uses to get there opens the door to unconstitutional restrictions on the voting rights of Kansans. Fourth, I agree the plaintiffs have established facts showing the signature verification requirement would violate Equal Protection and Due Process guarantees, but I reject the new standards the majority appears to set for evaluating such claims. Fifth, I disagree with the majority's conclusion that the plaintiffs failed to state a claim for relief that the ballot collection inhibits core political speech; I believe the plaintiffs met that challenge. Finally, I reject the majority's holding that physical ballot collection and delivery can never be protected as expressive conduct.

I concur in the majority's holding that the plaintiffs are substantially likely to prevail on the merits of their claim that the false representation provision violates the right to free speech. I also concur in its decision to reverse the dismissal of the plaintiffs' claim against the signature verification requirement. But this is where I leave the majority.

*Voting Rights Under Section 2 of the Kansas Constitution Bill of Rights*

The plaintiffs argued the Kansas Constitution protects the right to vote in three provisions:  section 1 of the Kansas Constitution Bill of Rights, which proclaims, "All men are possessed of equal and inalienable natural rights, among which are life, liberty, and the pursuit of happiness"; section 2 of the Kansas Constitution Bill of Rights, which proclaims, "All political power is inherent in the people, and all free governments are founded on their authority, and are instituted for their equal protection and benefit"; and article 5, section 1 of the Kansas Constitution, which deems as a "qualified elector" "[e]very citizen of the United States who has attained the age of eighteen years and who resides in the voting area in which he or she seeks to vote."

The majority concludes voting is a political right, not a natural one, so section 1 offers it no protection. I agree. The majority then affirms that article 5, section 1 affixes the qualifications of an elector and the Legislature can add nothing more. I agree with this in general, although I reject some of the majority's analysis as it pertains to how a legislature might contravene this mandate, as I explain in more detail below. But, to begin, I turn to the plaintiffs' claim that section 2 of the Kansas Constitution Bill of Rights protects a right to vote.

I consider their claim pivotal and would hold that section 2 provides the plaintiffs with a separate basis for pursuing relief. The language and history of section 2

demonstrate the Kansas Constitution empowers Kansas citizens with a constitutional right to majority rule through the vote.

Section 2 of the Kansas Constitution Bill of Rights declares:  "All political power is inherent in the people, and all free governments are founded on their authority, and are instituted for their equal protection and benefit."

This or similar language is included in the Declaration of Independence and all but one other state constitution. This language is universally understood as an "express commitment to popular sovereignty." Bulman-Pozen & Seifter, *The Democracy Principle in State Constitutions*, 119 Mich. L. Rev. 859, 869 (2021).

The concept of popular sovereignty is nothing new; its roots can be found in Aristotle's political writings. Bartrum, *The People's Court:  On the Intellectual Origins of American Judicial Power*, 125 Dick. L. Rev. 283, 289 (2021). This idea grew and matured, and it found full expression with John Locke. Locke posited that people are, by nature, free, equal, and independent but could consent to being governed. Locke argued that "when any number of men have so consented to make one community or government, they are thereby presently incorporated, and make one body politic, wherein *the majority have a right to act* and conclude the rest." (Emphasis added.) Locke, Two Treatises of Government Bk. II, § 95.

The United States Supreme Court has opined that this Lockean philosophy expresses "[t]he people's ultimate sovereignty" and framed the basis of the Declaration of Independence. *Arizona State Legislature v. Arizona Indep. Redistricting Comm'n*, 576 U.S. 787, 820, 135 S. Ct. 2652, 192 L. Ed. 2d 704 (2015); see also Gardner, *Consent, Legitimacy and Elections: Implementing Popular Sovereignty Under the Lockean Constitution*, 52 U. Pitt. L. Rev. 189, 193 (1990) (Declaration of Independence "draws directly on the political theories of John Locke," which "provided a comprehensive

44

rationale not only for the American Revolution . . . but also for the founding of a new nation."). Almost every state, including Kansas, included the language of the Declaration of Independence in their constitutions, thereby cementing their commitment to the ideals of Lockean popular sovereignty. See *The Democracy Principle in State Constitutions*, 119 Mich. L. Rev. at 869 (all but one state constitution includes same or similar language from Declaration of Independence). Kansas guarantees its commitment to function according to those ideals in section 2 of its Bill of Rights.

This court has long held that the declarations of rights in the Bill of Rights are judicially enforceable, meaning the government may not contravene whatever rights the provisions describe. *Winters v. Myers*, 92 Kan. 414, 428, 140 P. 1033 (1914) (section 2, "while declaring a political truth, does not permit legislation which trenches upon the truth thus affirmed"); *Atchison Street Rly. Co. v. Mo. Pac. Rly. Co.*, 31 Kan. 660, 665, 3 P. 284 (1884) (the Kansas Bill of Rights "limit[s] the power of the Legislature" so that "no law can be sustained which trenches upon the rights guaranteed by them, or which conflicts with any limitation expressed in them"); see also *Hodes & Nauser, MDs v. Schmidt*, 309 Kan. 610, 634, 440 P.3d 461 (2019) (discussing enforceability of Kansas Constitution Bill of Rights).

This venerable history demonstrates section 2 of the Kansas Constitution Bill of Rights prohibits the governing body from usurping the people's political power. In our republican form of government, this power takes form through majority vote. It follows that section 2 prohibits government action that inhibits majority rule through the vote.

The Supreme Court of California has expressed a similar sentiment with regard to its own constitution:

"The Constitution of this State was created and adopted by a free people in order to secure to themselves and their posterity the blessings of liberty. In the declaration of

45

rights . . . it is declared that all political power is inherent in the people; that government is instituted for the protection, security and benefit of the people . . . . The Constitution secures to the citizen the right of suffrage, without which he could not exert his political power, and without which he would be impotent to secure to himself the full enjoyment of life, liberty and property." *Knowles v. Yates*, 31 Cal. 82, 87, 1 P.L.M. 149 (1866).

Two distinguished law professors and scholars of constitutional law agree in an amicus brief to this court that section 2 "identifies popular sovereignty and self-government as the document's animating principles." They further explain the Kansas Constitution continues to highlight the central importance of majority rule through suffrage in the provisions that follow. "To facilitate self-rule," the professors point out, "the Constitution establishes democratically accountable elected institutions . . . and places the power to approve constitutional amendments and to call a constitutional convention directly in the people's hands . . . ." (citing constitutional provisions providing for election of executive offices and legislators, retention elections of justices, and recall of executive and legislative officials, and providing for constitutional amendments and conventions). The professors posit that "[t]he franchise is the linchpin of the people's Constitution. It ensures that the people truly choose their representatives and provides them opportunities to express their collective will." They counsel that, in expressing the central importance of voting, the text of the Constitution demands its "steadfast[] protect[ion]."

This court expressed a similar sentiment in 1963 when it cited section 2, along with section 1 of the Kansas Constitution Bill of Rights, in support of the notion that "[w]ithin the express and implied provisions of the Constitution of Kansas every qualified elector of the several counties is given the *right to vote* for officers that are elected by the people, and he is possessed of equal power and influence in the making of laws which govern him." (Emphasis added.) *Harris v. Shanahan*, 192 Kan. 183, 204, 387 P.2d 771 (1963).

History reveals not only that section 2 protects the right to majority rule through the right to vote, but that this protection is meant to be quite robust. One scholar explains that, as the states formed and drafted their constitutions during the revolutionary period,

> "suffrage was defined as a constitutional issue: all of the early state constitutions (except that of Delaware) treated the right to vote as a matter of fundamental—and thus constitutional—law, rather than statute law. Implicit in this treatment was the notion that suffrage requirements ought to be durable and difficult to change; legislatures and governors alone were not entrusted with the power to tamper with the right to vote. In theory at least, the franchise could be broadened or narrowed only through constitutional revision or amendment." Keyssar, The Right to Vote: The Contested History of Democracy in the United States, p. 17 (revised ed. 2009).

The notion that suffrage was a critical right only grew in the time leading up to Kansas' founding. Between 1776 and 1850, economic and class lines began to blur, and widespread migration diversified the makeup of the nation's inhabitants, leaving much of the country ineligible to vote. In response, those with voting power slowly dismantled the property and citizenship requirements originally imposed on voting. Keyssar, The Right to Vote, p. 28-31. During this time, "more and more Americans came to believe that [male] people . . . were and ought to be sovereign and that the sovereign 'people' included many individuals who did not own property. Restrictions on the franchise that appeared normal or conventional in 1780 came to look archaic in subsequent decades." Keyssar, The Right to Vote, p. 35.

It was against this backdrop that the drafters composed the Kansas Constitution, and, unsurprisingly, the free state founders took an expansive view (for the time) of suffrage. They granted it to any white male 21 or older who lived in Kansas for six months and was a United States citizen or an immigrant who had declared his intention to become a citizen. Kan. Const. art. 5, § 1 (1859). It disqualified from voting those "under guardianship, . . . insane . . . [or] convicted of treason or felony, unless restored to civil

rights," and any "solider, seaman or marine." Kan. Const. art. 5, §§ 2, 3 (1859). And it directed the Legislature to pass "laws as may be necessary for ascertaining by proper proofs, the citizens who shall be entitled to the right of suffrage" established by the Constitution. Kan. Const. art. 5, § 4 (1859).

This latter provision was added by amendment and originally rejected until the delegate who offered it explained

"it is to authorize and require the Legislature to pass a registry law . . . . A doubt is entertained in the mind of some whether the Legislature have the right to pass a registry law, unless there is a constitutional provision to authorize it. In order to relieve the case from all doubt, I propose this section." Proceedings and Debates of the Kansas Constitutional Convention (Drapier ed. 1859), reprinted in Kansas Constitutional Convention 513 (1920).

After this explanation, the registry provision was adopted. Kansas Constitutional Convention, 513.

This history supports the plaintiffs' position that the drafters of the Kansas Constitution intended the Kansas Constitution to steadfastly protect the right to suffrage. So impenetrable did the drafters regard this right to effect majority rule, they thought it necessary to explicitly grant the Legislature the power to enact a registry law in article 5, section 4. I would recognize the drafters' commitment to robustly protect popular sovereignty through the vote and hold that any impairment of section 2 must withstand our most "searching" of standards—strict scrutiny. *Hodes*, 309 Kan. at 663 (deciding strict scrutiny applies to infringements of natural rights because it is most rigourous standard available).

This leads to one of the defendants' most strongly asserted arguments: almost anything could impair someone's right to vote, so election-related legislation cannot be

subject to strict scrutiny review; it must instead be given great deference lest "chaos reign and public confidence in the democratic process diminish."

To that, the plaintiffs responded that "benign election regulations" do not impair the right to vote protected by section 2 of the Kansas Constitution Bill of Rights. They argued before us that the court should subject to strict scrutiny review only that legislation which creates a "systemic burden" on the right to vote.

The plaintiffs offer an apt barometer for measuring whether legislation invades the rights protected by section 2's commitment to majority rule. Legislation that burdens voting for all or many qualified electors endangers the people's collective power. If the Legislature takes this step, it must produce a compelling reason for doing so and prove its action is narrowly tailored to furthering that interest. Less impactful legislation may still be constitutionally problematic because it falls outside the Legislature's police power or imposes additional qualifications on the right to vote in contravention to article 5, section 1, but it does not run afoul of section 2 of the Bill of Rights.

I would hold the plaintiffs have pleaded facts sufficient to state a claim that the signature verification requirement and the ballot collection restriction impair the right to majority rule through the vote in section 2.

According to the plaintiffs' facts, some voters will be disenfranchised by the signature verification requirement because their signatures will be erroneously flagged as a mismatch, and election officials will fail to contact those voters. This is an obvious burden. See *Democratic Executive Committee of Florida v. Lee*, 915 F.3d 1312, 1321 (11th Cir. 2019) (signature verification requirement that would result in some valid ballots being cast out imposed "serious burden" on right to vote). And the plaintiffs' facts suggest it could be a burden to a great many voters. They assert in the 2020 general election, over 450,000 voted by mail and over 350,000 submitted advance voting ballots

in person. They further asserted that signature matching is consistently unreliable and that laypersons misidentify authentic signatures as forgeries at least 26 percent of the time. This puts a few hundred thousand qualified voters at risk of total disenfranchisement. These are enough facts to get the plaintiffs beyond the motion to dismiss stage on their claim the signature verification requirement burdens the right to majority rule through the vote in section 2.

As for the ballot collection restriction, the plaintiffs' facts indicate it threatens to cut off voting access for "many" qualified electors. The plaintiffs assert that Kansans across the state rely on others to deliver their ballots in order to cast a vote, "includ[ing] . . . voters in western Kansas where mailboxes are often centrally located in communities far away from individual homes, [and] Native voters living on tribal lands who may have to travel for hours on unpaved roads to access mail services or election offices. . . ." They also assert this would cut off voting for "'several hundred'" voters in Concordia who live in group homes and rely on a few volunteers to deliver all their ballots. They further pleaded that "communities of faith . . . often collect and deliver ballots from shut-ins, the elderly, the disabled, and others who are restricted in their movements." They reported that "many Kansans with disabilities" have difficulty remembering or physically managing to mail ballots, so they rely on delivery by a volunteer. Finally, the plaintiffs asserted that they deliver ballots for "those Kansans with limited access to transportation, work commitments, school schedules, and family care responsibilities that would otherwise prevent them from voting." Again, the plaintiffs have pleaded facts sufficient to state a claim that the ballot collection restriction impairs the right to majority rule through the vote in section 2. I would reverse the district court's dismissal of this claim.

The majority paints a much different picture of section 2. Although it extols its express statement that "all political power is inherent *in the people*" as "one of our most cherished principles of government," it writes it into functional irrelevance. See slip op. at 23. The majority begins by telling us, "At the heart of section 2 . . . is the notion of

*delegated power*." Slip op. at 23. It then sets off on a discussion of how the people delegate this power—through election or appointment *by elected officers*—and the mechanics of those processes. It concludes by telling us that section 2 is inapplicable here because the challenged legislation is about how to delegate power, "not to the very existence of delegated power as guaranteed by section 2." Slip op. at 26.

The majority's analysis is startling for many reasons. First, it describes section 2 as a "statement of principle," slip op. at 23, presumably meaning it is unamenable to judicial enforcement. In other words, the majority asserts the political power of the people is simply a "glittering generality" that has no practical implications for Kansas voters. But this stands in stark contrast to previous declarations from this court. See *Atchison Street Rly. Co.*, 31 Kan. 660, Syl. ¶ 1 ("The bill of rights is something more than a mere collection of glittering generalities; some of its sections are clear, precise, and definite limitations on the powers of the legislature, and all other officers and agencies of the state; and while others are largely in the nature of general affirmations of political truths, yet all are binding on legislatures and courts, and no act of the legislature can be upheld which conflicts with their provisions, or trenches upon the political truths which they affirm.").

But perhaps more concerning is the majority's interpretation of section 2 as a *delegation* of power without any recognition of the power the people *retain*. Under the foundational notions of popular sovereignty, which our history shows section 2 was meant to capture, the people may assign their power to a governing body, but "there remains still in the people a supreme power to remove or alter the legislative, when they find the legislative act contrary to the trust reposed in them." Locke, Two Treatises of Government Bk. II, § 149. The majority quietly sweeps this key principle under the rug. In so doing, it unburdens itself of the people's ultimate sovereignty and clears a path to its conclusion that section 2 has nothing to do with voting. This dangerous repainting of our constitutional guarantees is nothing short of astonishing.

51

The majority also tells us the challenged legislation relates only to "how" the people delegate their power, not the "existence" of delegated power, so section 2 is inapplicable. This disingenuous reframing of the plaintiffs' claim ignores completely their allegation that the challenged statutes deprive the people of their ability to vote, i.e., wield their retained power. The majority's casual erasure of this claim through its revisionist lens does a disservice to not only the plaintiffs, but also our continuing jurisprudence and our democratic institution. I join my colleague Justice Standridge in her apt criticism of this portion of the majority's analysis.

Finally, the majority seems to decide that, even if there were some protections for voting in section 2, they are not specific or explicit enough to enforce because article 5 speaks more directly to voting. Again, I join my colleague in her condemnation of this seemingly new approach to constitutional interpretation.

The majority assures us its nullification of the constitutional protection of majority rule "does not mean that constitutional voting guarantees are somehow weak or ineffective" because we still have article 5, which affixes the qualifications of an elector and "provides the strongest possible constitutional protections." Slip op. at 29. This is a hollow protection. Of what value is being an elector if one has no constitutional right to vote? And if there is no right to vote, how are the people to assert their political power? How will the majority rule? The silence by the majority on this crucial question is deafening.

*Voting Rights Under Article 5 of the Kansas Constitution*

I find further error in the majority's analysis of that "strong" article 5 protection. Section 1 of article 5 provides that "[e]very citizen of the United States who has attained the age of eighteen years and who resides in the voting area in which he or she seeks to

52

vote shall be deemed a qualified elector." The majority declares this provision protects a "right to be a qualified elector" and thereby prohibits the Legislature from adding "any extra-constitutional qualifications to the precisely defined right to suffrage." Slip op. at 29. Then, cloaked in its assertion that article 5, section 1 provides steadfast protection, the majority concludes the plaintiffs have failed to submit a claim that the signature verification requirement or ballot collection restriction violates this protection.

I agree article 5, section 1 affixes the qualifications one must have to be an elector, thereby prohibiting the Legislature from adding anything more. But I find confusing the framework the majority sets out for analyzing claims under article 5, and I disagree with its conclusion that the plaintiffs failed to state a claim for relief that the signature verification requirement violates its protections. And while I agree the plaintiffs failed to submit facts to show the ballot collection restriction is an additional qualification in violation of article 5, I am troubled by how the majority got there.

I turn first to the majority's framework for article 5 claims, which shifts like the sands of the desert and makes it impossible for a hopeful voter to gain any solid footing. Early in its analysis the majority announces, "to prevail on a claim that the article 5 right to suffrage has been violated, a plaintiff must show that the Legislature has imposed what amounts to a new, extra-constitutional qualification on the right to be an elector—that is, *the law must be shown to unreasonably burden the right to suffrage.*" (Emphasis added.) Slip op. at 30-31. It observes that article 5, section 4 provides that the "legislature shall provide by law for proper proofs of the right of suffrage," but opines that "unreasonable burdens, as a matter of law, bear no reasonable relationship to the Legislature's lawful role of providing proper proofs." Slip op. at 30-31.

But the majority abandons this framework. While it initially declared "unreasonable burdens" cannot be laws for proper proof, it later announces that laws for proper proof cannot be unreasonable burdens. Slip op. at 31 ("reasonable regulations

53

requiring proper proofs [are] not the equivalent of imposing a new qualification on the right to be an elector" and, thus, "cannot violate the article 5 right"). In yet another iteration of the proper test, the majority appears to announce legislation violates article 5 if it is a new qualification *and* it unreasonably burdens the right to vote. Slip op. at 33 ("we must ask: Is the imposition of the signature requirement an impermissible new qualification on the right to be an elector which unreasonably burdens the right of suffrage"). And in a final adjustment to its approach, the majority announces a law does not violate article 5 if "its burdens are reasonably related to the Legislature's duty and prerogative to provide proper proofs." Slip op. at 34. I cannot discern from the majority's opinion what a voter needs to show to convince a court that legislative action has violated article 5. I can only hope future litigants have better luck.

In the absence of any discernable description of what a court *should* do, I turn to what the majority *did* in its analysis. True to its initial bait and switch, the majority spends no time considering the burdens of the signature verification requirement or the ballot collection restriction in its analysis. It first concludes the signature verification requirement is authorized by article 5, section 4 as a reasonable law for proper proofs. It cites *State v. Butts*, 31 Kan. 537, 2 P. 618 (1884), in support.

In *Butts*, this court held that a preelection day registry requirement did not violate article 5, section 1 as an additional qualification to being an elector. It relied on article 5, section 4, concluding that this provision "manifestly contemplates a registration prior to the day of election." *Butts*, 31 Kan. at 554. It held that any "reasonable provision for" "ascertaining beforehand by proper proof of the persons who should, on the day of election, be entitled to vote" was a proper exercise of article 5, section 4. 31 Kan. at 554. It reasoned the registry provision at issue was constitutional because there were "ample facilities for registering . . . and the opportunities for registering [were] continued down to within a reasonable time of the election day." 31 Kan. at 554.

The signature verification requirement is not a "law for proper proof" as contemplated by section 4. This provision directs the Legislature to establish a mechanism for ascertaining that hopeful voters hold the qualifications of an elector, i.e., they are 18 years old, are a citizen of the United States, and reside within the voting area in which they hope to vote. *Butts*, 31 Kan. at 554 ("Obviously, what was contemplated [by article 5, section 4] was the ascertaining beforehand by proper proof of the persons who should, on the day of election, be entitled to vote."); see Kan. Const. art. 5, § 1; *Wycoff v. Board of County Commissioners*, 191 Kan. 658, 669, 383 P.2d 520 (1963) (quoting *Butts* to support notion that "'it is well settled in this state that the legislature may require registration as a prerequisite to the right to vote'"); Kansas Constitutional Convention, 513 (delegate who offered section 4 explaining it is meant "to authorize and require the Legislature to pass a registry law").

The signature verification requirement at issue before us now is not a mechanism of proper proofs through which the State may ascertain that hopeful voters hold the qualifications of an elector. The voter to whom an advance or mail-in ballot is attributed has already registered and established they are a qualified elector entitled to the right of suffrage. The signature verification requirement demands something more.

The majority claims this court has previously held that "[t]he verification processes relating to mailed or absentee ballots have been recognized by this court as the 'proofs' allowed under article 5, section 4," citing to *Burke v. State Board of Canvassers*, 152 Kan. 826, Syl. ¶ 6, 833, 107 P.2d 773 (1940), and *Lemons v. Noller*, 144 Kan. 813, 826, 63 P.2d 177 (1936). Slip op. at 27-28. But neither case supports the majority's position.

*Burke* held that legislation directing the county clerk to determine whether people applying for absentee ballots had the requisite voter qualifications was a law for proper proof as contemplated by article 5, section 4. It explicitly distinguished this from the state

55

board of canvassers' responsibility to handle already-cast absentee ballots and "determine that the person whose vote is to be counted is the same person who was certified by the county clerk as a qualified elector." *Burke*, 152 Kan. 826, Syl. ¶ 5. The latter was not challenged and thus the *Burke* court passed no judgment on whether it was a valid exercise of section 4. Similarly, in *Lemons*, the court opined that the Legislature may require that applications for absentee ballots contain "proofs" of a hopeful voter's qualifications. *Lemons*, 144 Kan. at 826. It said nothing of whether the Legislature could require further validation after the ballot had been cast.

Nonetheless, the majority concludes the signature verification requirement is a demand for proper proofs as contemplated by article 5, section 4 and then quickly decides it is reasonable because it is "important." Slip op. at 32. Its reasonableness conclusion rests on its declaration that "[e]nsuring that all Kansas voters are properly qualified to be electors is just as important as ensuring that no extra-constitutional qualifications are imposed" because "permitting an unqualified elector has much the same effect as prohibiting a qualified one." Slip op. at 32. "Each of these outcomes disenfranchises the genuine vote of someone who is qualified to vote." Slip op. at 32. In support, the majority observes that members of the Kansas Constitutional Convention of 1859 were aware antislavery and proslavery forces accused each other of "'procuring votes from persons not entitled.'" Slip op. at 32.

The majority is in a china shop swatting with a hammer at imaginary flies. I have problems with this policy-laden endeavor. First, the signature verification requirement does not ferret out whether the voter who sent in the ballot has the requisite qualifications for voting. As discussed earlier, the voter to whom the ballot is ascribed has already established those qualifications. Because the legislation does not do what the majority says is so important, that cannot serve as the basis for the majority's determination that it is "important" and thus "reasonable." Second, even if the legislation were to function as a check for requisite qualifications, the plaintiffs' facts indicate Kansas has no problem

56

with unqualified individuals trying to vote. The Secretary of State's office reported that "Kansas did not experience any widespread, systematic issues with voter fraud, intimidation, irregularities or voting problems" in 2020. The majority cites a problem with unqualified voters trying to vote in 1859, which may have made legislation to counter that problem important or reasonable *in 1859*. But elections have evolved in 160 years, and there is no evidence we face that problem today. In contrast, the plaintiffs have submitted facts indicating the signature verification requirement disenfranchises qualified electors in Kansas. I cannot see how it can thus be "important" and "reasonable" because this court thinks it addresses a problem that *does not exist*.

In a final unsettling twist to its analysis, the majority basically acknowledges that under the plaintiffs' facts, the signature verification requirement will result in legally cast ballots not being counted. But it then confidently asserts that this "does not mean that citizen has been disenfranchised." Slip op. at 34. No, the majority declares, "citizens wishing to exercise the right of suffrage" simply failed to "meet the reasonable requirements of the Legislature." Slip op. at 34. This is the citizen who has already proved they were a qualified elector and followed every one of the Legislature's requirements for voting. Their vote is not counted because of someone else's error. This is disenfranchisement.

I have concluded that the signature verification requirement is not a law for proper proofs. While this does not lead automatically to the conclusion that the legislation is an additional qualification in violation of article 5, section 1, I believe the plaintiffs have asserted facts that show it is. According to the plaintiffs, citizens who have already proved they are qualified electors and who have legally cast a ballot will be stripped of this status because they failed to produce a signature that an election official believes is a "match" to an earlier signature. This is an "extra-constitutional qualification," slip op. at 30-31, that impairs the right to qualified elector status guaranteed by article 5.

The majority also concludes the ballot collection restriction cannot violate article 5, section 1. I agree that, in this case, the plaintiffs have not asserted facts that show the ballot collection restriction amounts to an additional qualification to being an elector and, consequently, the article 5 claim fails. As discussed, it may create a systemic burden for qualified electors seeking to vote, but it does not place additional requirements on whom the government deems a qualified elector.

However, I question the majority's path of analysis. Again, while the majority initially announced that "unreasonable burdens" violate article 5, it spends no time evaluating the burdens the plaintiffs have pleaded. Instead it calls the ballot collection restriction a "regulation of the mechanics of an election." Slip op. at 38. It tells us that "[t]hese matters are governed by article 4" and shuts the door because "the League has not asserted an article 4 violation." Slip op. at 38.

I do not follow the majority's logic. It appears to decide the ballot collection restriction cannot violate article 5 because it might violate article 4. But this cannot be right. State action can violate more than one constitutional provision. See, e.g., *Ernest v. Faler*, 237 Kan. 125, 138, 697 P.2d 870 (1985) (Kansas statute violated equal protection and due process). The majority acknowledges as much in this case by addressing the plaintiffs' claims under multiple provisions of the Kansas Constitution.

Perhaps the majority is deciding that article 4 authorizes the ballot collection restriction without giving us any analytical framework or discussion. It implies as much when it says "[v]oters have numerous avenues available to deliver their ballots." Slip op. at 38. But this, of course, contradicts the plaintiffs' facts; they've alleged that, for many, delivery by a volunteer is the only option and that limiting the number of ballots that can be collected by a single volunteer cuts off their avenue for voting.

Or, perhaps, the majority means to hold that anything that can be characterized as a regulation of the mechanics of an election can never be an additional qualification on the right to vote. But this too must be untrue. Suppose the Legislature does away with all accommodations for voters who need help accessing the polls or completing a ballot. This is a regulation on the mechanics of an election, but it surely adds an additional qualification to being an elector.

Ultimately, I cannot say for sure what path the majority takes to decide the ballot collection restriction does not violate article 5, section 1. That alone strikes me as a notable problem.

In sum, I believe the text and history of section 2 of the Kansas Constitution Bill of Rights show it was meant to protect majority rule through the vote. Consequently, government action that imposes a systemic burden on voting access should be upheld only if the government shows it withstands strict scrutiny. The plaintiffs have asserted facts that would establish the signature verification requirement and the ballot collection restriction impose systemic burdens on the right to vote. The plaintiffs' facts also establish that the signature verification requirement imposes an "extra-constitutional qualification on the right to be an elector" in contravention of article 5, section 1. Slip op. at 30-31.

*Equal Protection and Due Process*

I turn now to the majority's analysis of the plaintiffs' equal protection and due process claims. The plaintiffs asserted the signature verification requirement violates their right to equal protection because it subjects legally cast ballots to non-uniform treatment throughout the state. The majority appears to agree legislation must not value one vote over that of another through arbitrary and non-uniform treatment. Slip op. at 36 ("If the determination of proper proofs is subject to arbitrary and non-uniform standards, different

59

citizens will be treated differently in violation of equal protection.") (citing *Bush v. Gore*, 531 U.S. 98, 104-05, 121 S. Ct. 525, 148 L. Ed. 2d 388 [2000]). It concludes the plaintiffs have set forth facts sufficient to show the signature verification requirement does not meet these demands. I agree. But I disagree with the inexplicable change the majority makes to the standard of evaluation it directs the district court to apply upon remand. It instructs the court to look for "reasonable uniformity upon objective standards." Slip op. at 35. I do not know where this language comes from, and I would not substitute it for the standard articulated by the United States Supreme Court in *Bush v. Gore*. I would direct the district court to utilize the standard as articulated: whether "[h]aving once granted the right to vote on equal terms, the State . . . by later arbitrary and disparate treatment, value[d] one person's vote over that of another." 531 U.S. at 104-05.

The plaintiffs also asserted that the signature verification requirement violates the right to procedural due process because it denies a liberty interest without the required process, i.e., "notice and an opportunity to be heard at a meaningful time and in a meaningful manner." *State v. Wilkinson*, 269 Kan. 603, 608, 9 P.3d 1 (2000). The majority appears to agree the legislation denies a liberty interest; it focuses only on whether the plaintiffs set forth facts sufficient to show the statute does not offer due process. It concludes the plaintiffs have done so.

I agree the signature verification requirement denies a liberty interest, and thus it must offer due process before such denial. I also agree the plaintiffs have set facts sufficient to show it fails to offer such process. But, again, I disagree with the toothless standard the majority sets forth for evaluating the claim as it moves forward. Instead of directing the district court to look to whether voters will receive "notice and an opportunity to be heard at a *meaningful* time and in a *meaningful* manner," (emphasis added) *Wilkinson*, 269 Kan. at 608, the majority declares the district court should look to whether the legislation provides "reasonable notice of defects and an opportunity to

cure." Slip op. at 37. Again, I do not know where the majority finds this standard, and I would not use it in place of established law.

*The Right to Free Speech Under Section 11 of the Kansas Constitution Bill of Rights*

Finally, I consider the majority's handling of the plaintiffs' claim that the ballot collection restriction violates their right to free speech under section 11 of the Kansas Constitution Bill of Rights. The plaintiffs argued that volunteers speak messages of civic participation and engagement when they collect and deliver ballots, and that the restriction limits their ability to spread this message. The majority abruptly concludes this claim must fail because "the delivery of ballots . . . is not speech or expressive conduct" and so "[r]estrictions on the number of advance ballots one person may deliver does not, in isolation, inhibit speech at all." Slip op. at 39. I diverge from the majority's analysis and dissent from its conclusion that the plaintiffs failed to state a claim for relief that the ballot collection restriction violates section 11.

The majority's analysis and its holding are short-sighted and conflict with United States Supreme Court precedent. In *Meyer v. Grant*, 486 U.S. 414, 108 S. Ct. 1886, 100 L. Ed. 2d 425 (1988), the Court struck down a prohibition on paying petition circulators as violating the First Amendment. It explained that the conversations that petition circulators have when seeking signatures, as well as the petition itself, constitute core political speech entitled to First Amendment protection. The Court held that prohibitions on paying circulators restrict this speech in part because it "limits the number of voices who will convey appellees' message and the hours they can speak and, therefore, limits the size of the audience they can reach." *Meyer*, 486 U.S. at 422-23. The Court found it immaterial that it was not the actual speech that the law prohibited, and that the "appellees remain free to employ other means to disseminate their ideas." *Meyer*, 486 U.S. at 424. According to the Court, the prohibition nonetheless implicated protected speech because it impeded "access to the most effective, fundamental, and perhaps

61

economical avenue of political discourse, direct one-on-one communication." *Meyer*, 486 U.S. at 424.

The plaintiffs have asserted that volunteers engage in actual speech that constitutes core political speech, or "interactive communication concerning political change," *Meyer*, 486 U.S. at 422, when they collect and deliver ballots. They have also asserted that a limit on collecting only 10 inhibits their "ability to disseminate their message" because it means ballot collectors will only get to speak with 10 people. Under the Court's reasoning in *Meyer*, the plaintiffs have pleaded facts sufficient to state a claim that the ballot collection restriction "reduc[es] the total quantum of speech on a public issue," *Meyer*, 486 U.S. at 423, thereby impeding the exercise of free speech in violation of section 11 and requiring the defendants show the legislation withstands strict scrutiny. See *Meyer*, 486 U.S. at 420 (laws burdening core political speech subject to "exacting scrutiny"); *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 346 n.10, 115 S. Ct. 1511, 131 L. Ed. 2d 426 (1995) (describing exacting scrutiny applied in *Meyer* as "strict scrutiny").

The majority concludes the present case is distinguishable from *Meyer* because the ballot collection restriction "'does not regulate something that the Plaintiffs use to speak and thereby target or burden that speech," "[n]or . . . 'make the creation of this speech "more costly" and thereby reduce its volume under the basic laws of supply and demand.'" Slip op. at 40 (quoting *Lichtenstein v. Hargett*, 83 F.4th 575, 586-87 [6th Cir. 2023]).

I agree the ballot collection restriction does not restrict something the plaintiffs use to speak; but neither did the regulation in *Meyer*—the regulation in *Meyer* prohibited paying people to circulate the plaintiffs' speech while leaving them free to continue to do so. The regulation was nonetheless burdensome to the plaintiffs' speech because it lessened the number of people willing to spread the plaintiffs' message, thereby reducing

its volume. Similarly, the ballot collection restriction lessens the number of people to whom the plaintiffs' volunteers will speak, thereby reducing the volume of their message.

Furthermore, while it is true the ballot collection restriction does not make speech more costly, that is a distinction without a difference at this motion to dismiss stage. The point is that the restriction reduces the volume of speech. In *Meyer*, the regulation made it more costly to spread the plaintiffs' message so, naturally, it reduced the volume of speech. Here, the plaintiffs have asserted that the ballot collection restriction lessens the number of people to whom the plaintiffs' volunteers will speak, thereby reducing the volume of the plaintiffs' speech. The plaintiffs should get a chance to prove this claim.

I address one final error in the majority's free speech analysis: its opinion that the physical collection and delivery of ballots itself (as distinct from speech that occurs during that activity) cannot be expressive conduct protected by section 11. The majority holds it cannot be expressive because it is no different from the postal service delivering a package. While the plaintiffs have not offered facts in this case to indicate the physical collection and delivery of ballots alone is expressive conduct protected by the Constitution, I disagree that it can never be so.

Conduct can be protected speech if it is meant to express a message and that message can be understood by others. *Cressman v. Thompson*, 719 F.3d 1139, 1149 (10th Cir. 2013) (under "*Spence-Johnson*" test conduct is expressive and protected by First Amendment if it is meant "to convey a particularized message" and there is "a great likelihood that the message would be understood by those who viewed the symbolic act or display"). In *VoteAmerica v. Schwab*, 576 F. Supp. 3d 862, 888-89 (D. Kan. 2021), the district court of Kansas concluded mailing personalized advance voting ballots constituted expressive conduct that qualified as core political speech. It reasoned the applications conveyed a pro-advance mail voting message and that the recipients were likely to understand that. See also *Priorities USA v. Nessel*, 462 F. Supp. 3d 792, 816-17

63

(E.D. Mich. 2020) (paying for transportation that would get voters to the polls was political expression because it was an effort "to encourage political activity").

Thus, the sweeping assertion that the physical collection and delivery of ballots will never be expressive conduct protected by section 11 is out of line with settled caselaw. Equally flimsy is the declaration that ballot delivery is analogous to a postal worker delivering a package. The differences between a volunteer collecting and returning a ballot for a fellow citizen while spreading a message of civic engagement and a government official fulfilling the duties of their job are too obvious to put on the page.

Nonetheless, the plaintiffs did not offer facts sufficient to show the physical collection and delivery of ballots is expressive conduct. They asserted volunteers "communicate [a] message of civic participation and engagement" and "encourage[] others to exercise their fundamental right to vote" through ballot delivery assistance. It is unclear through the petition whether the volunteers intend to convey this message through the collection and delivery itself or if they express this message with actual speech while collecting and delivering. But even if one could infer the former, the plaintiffs did not offer any facts indicating people who witnessed this activity understand this to be the message. This defeats any claim in this case that the ballot collection and delivery itself is expressive conduct.

In sum, I would affirm the Court of Appeals holding that the district court erred in dismissing the plaintiffs' claim that the ballot collection restriction violates the right to free speech in section 11 of the Kansas Constitution Bill of Rights. They have pleaded facts sufficient to show the legislation inhibits the core political speech in which they engage while collecting and delivering ballots.

*Conclusion*

Today I join the majority in some of its analysis and part of its decision. But I do not follow their slim majority down the path it takes away from our founders' dedication to popular sovereignty. By nullifying section 2 of the Kansas Constitution Bill of Rights, the majority gives the governing body—the body created to work *for the people*—the power to override the collective will and transform our democracy into rule by the few for the few. I will not join my four colleagues on that ill-fated journey.

* * *

BILES, J., concurring in part and dissenting in part:  The Kansas Constitution explicitly sets forth—and absolutely protects—a citizen's right to vote as the foundation of our democratic republic, so it is serious business when a government official in one of our 105 counties rejects an otherwise lawful ballot just by eyeballing the signature on the outside envelope. See K.S.A. 25-1124(b), (h). I write separately because I find it difficult to track what the majority opinion says in this regard, and while I very much agree with Justices Rosen and Standridge, they don't quite capture what I see as the majority's limitations and modest successes.

I've done this before when a majority provided meager direction for applying its standard and what guidance it did provide in my view was more confusing than clarifying—leaving "the trial court to fend for itself." See *Hodes & Nauser, MDs v. Schmidt*, 309 Kan. 610, 682, 440 P.3d 461 (2019) (Biles, J., concurring). I do so again today because I see that happening here, and the district court needs to sort all this out in short order as the election season looms.

*The majority opinion does not overrule prior caselaw.*

This is important. I suspect the majority opinion is written as it is—with lengthy sections lacking citation to legal authority—to preserve its meager four votes. See, e.g., slip op. at 23-26 (rationalizing how section 2 does not expressly protect a right to vote); slip op. at 28-29 (providing no right to vote exists without the Constitution or a statute providing a right to elect). But in ruling as it does, the majority does not confront substantive Kansas caselaw that must take a prominent role on remand. For instance, consider *Provance v. Shawnee Mission U.S.D. No. 512*, 231 Kan. 636, 641, 648 P.2d 710 (1982), in which a unanimous court declared 42 years ago:

> "The 'compelling state interest' standard, as it has come to be called, is applied whenever the classification interferes with the exercise of a fundamental right under the Constitution. . . . We agree the right to vote for elected representatives is fundamental 'because statutes distributing the franchise constitute the foundation of our representative society.' [Citations omitted.]"

There, the statute's validity was challenged solely under the federal Constitution; our caselaw, dealing with the state Constitution, is sprinkled with similar statements. See slip op. at 45-47 (Rosen, J., concurring in part and dissenting in part); slip op. at 79-80 (Standridge, J., concurring in part and dissenting in part). Notable among these cases are: *Moore v. Shanahan*, 207 Kan. 645, 649, 486 P.2d 506 (1971) ("Since the right of suffrage is a fundamental matter, any alleged restriction or infringement of that right strikes at the heart of orderly constitutional government, and must be carefully and meticulously scrutinized.") and *Harris v. Shanahan*, 192 Kan. 183, 204, 387 P.2d 771 (1963) ("Within the express and implied provisions of the Constitution of Kansas every qualified elector of the several counties is given the right to vote for officers that are elected by the people, and he is possessed of equal power and influence in making of the laws which govern him [under] Bill of Rights, Kansas Constitution, Sections 1, 2."). They remain good law,

even though the majority dwells on concepts it styles as "delegation of power" and "proper proofs." See slip op. at 23-25, 30-32.

It is well established that once a court establishes a point of law, both the same court and lower courts will generally follow that precedent in later cases. See *State v. Sherman*, 305 Kan. 88, Syl. ¶ 2, 378 P.3d 1060 (2016) ("The application of stare decisis ensures stability and continuity—demonstrating a continuing legitimacy of judicial review. Judicial adherence to constitutional precedent ensures that all branches of government, including the judicial branch, are bound by law."). And when it is time to step away from a prior case, we do so only after demonstrating we are clearly convinced it was originally erroneous or is no longer sound, and that departing from that precedent will result in more good than harm. 305 Kan. 88, Syl. ¶ 3. My point is that we don't avoid caselaw by implication, so the majority's failure to tackle stare decisis to distance itself from cases like *Provance*, *Moore*, and *Harris* means they still inform the scrutiny and guiding principles the district court must comply with on remand to protect the vote. And while the majority asserts *Harris* cites section 2 only for equal protection purposes, *Harris* plainly shows section 2 protects the political right to vote—as opposed to section 1's protection of natural rights. See *Harris*, 192 Kan. at 188 (citing Kan. Const. Bill of Rights, §§ 1, 2).

As this case returns to the district court, the majority requires the State implement procedures establishing reasonable notice to a voter and an opportunity to be heard at a meaningful time and in a meaningful manner to contest the disqualification of otherwise valid ballots and to cure deficiencies based on an apparent signature discrepancy. Slip op. at 36. That is a tall order. The majority explains the State cannot succeed in "ensuring that no qualified elector will have his or her vote 'not count' either by *actually* not counting it, or by having its effect diluted by the counting of illegitimate votes." Slip op. at 32.

In other words, the likelihood of having a ballot discarded for signature mismatch must be the same in Wyandotte County as in Gove County.

With these requirements in mind, cases like *Provance*, *Moore*, and *Harris* must work in harmony with the majority's crafted test from *State v. Butts*, 31 Kan. 537, 555, 2 P. 618 (1884). See slip op. at 29-31. The law under scrutiny in *Butts* required every city clerk in a first- and second-class city give a voter registry certificate to a properly registered person, having listed their name, age, occupation, and residence in the pollbook prior to election. That law set objective standards applying uniformly across the state, which the *Butts* court noted in upholding the challenged law. Cf. Black's Law Dictionary 1291 (11th ed. 2019) (defining "objective" as "based on externally verifiable phenomena, as opposed to an individual's perceptions, feelings, or intentions").

My argument is simply that all our caselaw comes into play as the State explains on remand how each local election official across 105 Kansas counties can "uniformly" and "objectively" target a citizen's ballot for disqualification, while achieving what the majority describes as "the strongest possible constitutional protections." See slip op. at 29.

*The "false representation" provision must die a quick death.*

This court unanimously agrees the district court misread the statutory scheme when it concluded the League did not have a substantial likelihood of prevailing on the merits. Slip op. at 19 ("The district court['s] . . . faulty statutory interpretation infected each portion of its free speech analysis, and we conclude that it abused its discretion by making an error of law when it denied the League's motion for temporary injunction.").

But unlike my colleagues, I would not remand the temporary injunction issue to analyze the remaining factors before enjoining K.S.A. 25-2438(a)(2) and (a)(3), because

all of the factors so strongly favor the League. See *Downtown Bar and Grill v. State*, 294 Kan. 188, 191, 273 P.3d 709 (2012) (five factors considered for issuing a temporary injunction). What the majority leaves for the district court to do wastes precious time. This is a free speech issue brought under section 11 of our Constitution's Bill of Rights, applying familiar law borrowed from federal First Amendment principles. It should go without saying that those who promote in good faith voter registration and participation in our elections cannot do so in fear of criminal prosecution—ever. But that is what this statute does, and the League's arguments on the remaining factors required for a temporary injunction were not seriously challenged by the State, so what's the point? If the State has something to argue here, it can do so when the time comes to consider making the injunction permanent.

*Signature verification presents a tough row to hoe for the State.*

Our court held long ago, "The primary object of an election law, which transcends all other objects in importance, is to provide means for effective exercise of suffrage." *Hooper v. McNaughton*, 113 Kan. 405, 407, 214 P. 613 (1923). One such means is the Advanced Voting Act, K.S.A. 25-1117 et seq., and its provision for how people can vote before a regular election day. See K.S.A. 25-1119(a) ("Any registered voter is eligible to vote by advance voting ballot on all offices and to vote by advance voting ballot on questions submitted on which such elector would otherwise be entitled to vote."). Advanced voting in Kansas has been authorized since 1967, and since it remains an approved statutory procedure, Kansans are entitled to rely on it as an "effective exercise of suffrage." 113 Kan. at 407. This means a law authorizing government officials to toss out ballots must withstand a demonstrably rigorous stress test.

As the majority explains, the current statutes—left unaided by administrative regulations promulgated to save them—fail if left standing alone. See slip op. at 35-37.

69

Let me illustrate the lax statutory language. Subsection (h) authorizes disenfranchisement of the advance ballot voter:

"Subject to the provisions of subsection (b), *no county election officer shall accept an advance voting ballot transmitted by mail unless the county election officer verifies that the signature of the person on the advance voting ballot envelope matches the signature on file in the county voter registration records*, except that verification of the voter's signature shall not be required if a voter has a disability preventing the voter from signing the ballot or preventing the voter from having a signature consistent with such voter's registration form. Signature verification may occur by electronic device or by human inspection. *In the event that the signature of a person on the advance voting ballot envelope does not match the signature on file in the county voter registration records, the ballot shall not be counted.*" (Emphases added.) K.S.A. 25-1124(h).

Meanwhile, subsection (b) provides a less-than-precise process for the soon-to-be-disenfranchised advance ballot voter to cure improperly rejected ballots:

"The county election officer *shall attempt to contact* each person who submits an advance voting ballot where there is no signature or where the signature does not match with the signature on file and allow such voter the opportunity to correct the deficiency *before the commencement of the final county canvass*." (Emphases added.) K.S.A. 25-1124(b).

This court unanimously agrees the district court misread these statutes, just as it did the false representation provision. For example, the district court held—despite express statutory language to the contrary—that "county election officials *must notify* an advance ballot voter of a missing signature or signature mismatch and provide an opportunity to cure before the commencement of the final county canvass." (Emphasis added.) That is plainly false. The statute only requires, "The county election officer *shall attempt to contact* each person . . . where the signature does not match . . . ." (Emphasis

70

added.) K.S.A. 25-1124(b). On remand, with the primary and general elections quickly approaching, the district court has no room for further errors.

Even so, subsection (h) could not be more subjective—it obviously fails the majority's uniform and objective standard because its language leaves each of our 105 county officials to exercise this authority on their own. And it is virtually certain that unguided practices will emerge to reject legitimate ballots without any accountability. This will disenfranchise a voter through no fault of their own or force them to bear additional burdens to cure the product of a haphazard process. Such a result is contrary to our state's defining principles. See *Harris*, 192 Kan. 183, Syl. ¶ 11 ("Under the republican form of government prescribed in the Constitution of Kansas, every citizen and qualified elector is entitled to a vote.").

On remand, the Secretary of State's administrative regulations will need to do the heavy lifting to save these statutes, if they even can. See K.S.A. 25-440 (Secretary of State may adopt rules and regulations relating to advance voting ballots and the voting thereof); see, e.g., K.A.R. 7-36-1 et seq. (absentee and advance voting). To that end, the litigation going forward must focus on how these regulations reliably and uniformly sift out the feared fraudulent ballots by objective means without denying legitimate voters their fundamental right to vote. This consideration necessarily includes analyzing the procedures and protections employed to issue an advance ballot, as well as carefully scrutinizing how a mismatched signature is flagged, how effectively the soon-to-be-disenfranchised voter is notified, and whether they are given a meaningfully reasonable opportunity to cure the perceived problem *before* the ballot is discarded.

The district court will need to find evidence that the State's implementation of advance balloting constitutes an "effective exercise of suffrage" before approving such a process. See *Hooper*, 113 Kan. at 407. We must not sacrifice legitimate ballots cast by eligible voters to defend against a canard.

To sum up, the proceedings on remand must embrace our prior caselaw and give practical meaning to such declarations as:

> "The right to vote in any election is a personal and individual right, to be exercised in a free and unimpaired manner, in accordance with our Constitution and laws. The right is pervasive of other basic civil and political rights, and is the bed-rock of our free political system." *Moore*, 207 Kan. at 649.

\* \* \*

STANDRIDGE, J., concurring in part and dissenting in part: In a troubling decision with far-reaching implications, the majority paradoxically holds that section 2 of the Kansas Constitution Bill of Rights—which states "[a]ll political power is inherent in the people, and all free governments are founded on their authority"—does not, in fact, protect the right to vote as this court has long held. To justify this puzzling holding, the majority construes section 2 as a mere general declaration of the people in delegating their power to government and finds the substantive right to vote is protected under article 5 instead. In doing so, the majority reframes plaintiffs' section 2 claim as a challenge to voting "mechanisms" without regard to the effect of this ends-justifies-the-means approach on plaintiffs' actual claim. The majority's section 2 decision defies history, law, and logic and is just plain wrong. Thus, while I join the majority in holding that the plaintiffs demonstrated a likelihood of prevailing on the merits of their false representation claim and in remanding the plaintiffs' signature verification requirement to consider whether it complies with constitutional guarantees of equal protection and due process, I dissent from the majority's analysis and decision on the plaintiffs' section 2 claims.

While I agree with the main points made by Justice Rosen and Justice Biles, I write separately to highlight some key flaws in the majority's analysis. First, in holding section 2 is merely a foundational political idea and not a substantive right to vote, the majority departs from this court's long-standing precedent recognizing voting as a substantive right grounded in the essence of a republican form of government. To arrive at this conclusion, the majority ignores this court's established rules of constitutional construction and, as a result, contravenes the framers' and adopters' clear intent. Next, the majority unilaterally and improperly reframes plaintiffs' section 2 claim so that it can apply its proposed test under article 5. Finally, the majority's article 5 analysis fails in that it incorrectly states the test announced in *State v. Butts*, 31 Kan. 537, 2 P. 618 (1884), to determine when a restriction on voting unconstitutionally burdens the right to vote.

1. *Section 2 substantively protects the people's right to vote.*

Applying this court's established rules of constitutional construction, it is patently clear that the framers and adopters of the Kansas Constitution intended section 2 to substantively protect the people's right to vote. This conclusion is bolstered by the Constitution's structure and ordering, which places the Bill of Rights before the Articles. For over 60 years, this interpretation of section 2 has been our precedent. Without even a hint that it's doing so, the majority overturns this precedent today. See *Moore v. Shanahan*, 207 Kan. 645, 649, 486 P.2d 506 (1971) (citing *Harris v. Shanahan*, 192 Kan. 183, 387 P.2d 771 [1963]).

1.1. *Rules of constitutional construction*

The majority acknowledges that the source of all political power is the people of Kansas and thus the government's ability to act on their behalf depends exclusively on their authority. See slip op. at 23. Yet the majority still concludes the people's right to

73

participate in the political process by voting is not protected by section 2 of the Kansas Constitution Bill of Rights because:

- Section 2 is merely a general declaration of "the foundational political principle of delegated power from the people to their free government." Slip op. at 1, Syl. ¶ 3.

- "The Kansas Constitution contemplates achieving section 2's on-going and perpetual delegation of power through varied mechanisms, including popular elections, limited elections, appointments, and succession." Slip op. at 2, Syl. ¶ 5.

- "Section 2 of the Kansas Constitution Bill of Rights does not address itself to these mechanisms of delegation. To find the controlling law of popular elections, we must look instead to the specific provisions in articles 4 and 5." Slip op. at 2, Syl. ¶ 6.

Significantly, this court previously rejected an interpretation of section 1 similar to the majority's interpretation of section 2 here. In *Hodes & Nauser, MDs v. Schmidt*, 309 Kan. 610, 440 P.3d 461 (2019), the dissent suggested the inalienable natural rights granted to the people in section 1 of the Kansas Constitution Bill of Rights are nothing more than "a blanket guarantee to all Kansans of the first rights of republican self-government," which the dissent described as "the right to participatory consent to government for the benefit of the common welfare, on the one hand, and the right to otherwise be free from arbitrary, irrational, or discriminatory regulation that bears no reasonable relationship to the common welfare, on the other." 309 Kan. at 766 (Stegall, J., dissenting).

After applying this court's long-standing rules of constitutional construction, the *Hodes* court soundly rejected this interpretation, holding the drafters and the adopters intended section 1 of the Kansas Constitution Bill of Rights to substantively protect each

74

person's individual inalienable natural rights from encroachment by the State. Yet the majority fails to mention, let alone apply, rules of constitutional construction before eliminating section 2 as a source of substantive political rights. This bears repeating: in deciding the Kansas Constitution Bill of Rights does not protect the right to vote, the majority does not perform the necessary analysis to faithfully interpret this founding document. Therefore, I undertake this essential inquiry myself in the context of the right to vote. I begin where the majority should have—with our rules of constitutional construction, which were clearly articulated over 80 years ago in *Hunt v. Eddy*:

- "'The fundamental principle of constitutional construction is to give effect to the intent of the framers of the organic law and of the people adopting it.'" 150 Kan. 1, 5, 90 P.2d 747 (1939).

- "'A constitutional clause must be construed reasonably to carry out the intention of the framers.'" 150 Kan. at 5.

- "In determining [the true intent of the framers and adopters] courts are not restricted and limited by a mere technical interpretation of the exact words employed but are required to place upon the constitutional provision involved a construction which will take into account the attendant circumstances." 150 Kan. at 5.

- "'[A constitutional clause] should not be construed so as to defeat the obvious intent if another construction equally in accordance with the words and sense may be adopted which will enforce and carry out the intent. The intent must be gathered from both the letter and spirit of the document.'" 150 Kan. at 5.

- "Where the purpose of the framers of constitutional provisions is clearly expressed it will be followed by the courts. Where terms of such provisions are not entirely free from doubt, they must be construed as nearly as possible in consonance with the objects and purposes in contemplation at the time of their adoption, and the words employed should be given a practical interpretation which will give them effective operation and suppress the mischief at which they were aimed." 150 Kan. 1, Syl. ¶ 3.

75

Summarized, this court must reasonably construe the language of our Constitution to give effect to the framers' and adopters' intent, accounting for the historical circumstances at the time of drafting. In doing so, the court must consider the object, scope, and "spirit" of the provision, not merely the technical language or "letter" of the text. Naturally, to glean the intent of the framers and adopters, the court starts with the language of section 2:

"§ 2. Political power; privileges. All political power is inherent in the people, and all free governments are founded on their authority, and are instituted for their equal protection and benefit." Kan. Const. Bill of Rights, § 2.

Section 2, entitled "Political power," begins with a clear expression of popular sovereignty: "All political power is inherent in the people, and all free governments are founded on their authority," meaning the people of Kansas are the source of all state political power. Thus, the government only has the power expressly delegated to it by the people of this state. Implied in this arrangement is the expectation that the people retain the right to meaningfully participate in the democratic process. This logically extends to the right to vote. By its very nature, the right to vote is an essential feature of democracy because it allows the people to influence government decisions and actions by electing (and removing) their representatives and expressing preferences on public policy matters put before the electorate. Therefore, the right to vote is implicitly protected under section 2's expression of popular sovereignty.

In conjunction, we consider the historical circumstances in which this provision was drafted. The Kansas Constitution was adopted in 1859 by a convention of delegates representing the people of the Kansas Territory. Kansas Constitution, Resolutions. At the time, Kansas was a frontier state grappling with issues related to slavery, suffrage, and democratic representation. From the historical record, it is clear the framers and adopters

76

sought to address these concerns, voting chief among them. Kansapedia, https://web.archive.org/web/20190621020221/https://www.kshs.org/kansapedia/kansas-constitutions/16532. This is also reflected by the placement of popular sovereignty at the top of the Bill of Rights, second only to the natural inalienable rights provision under section 1. It is hard to imagine the framers and adopters did not mean for this provision to carry any substantive weight in the form of judicially enforceable rights.

Although section 2 does not explicitly use the term "vote," its reference to popular sovereignty conveys the obvious purpose of the provision is to protect this principle, which includes the right to vote. Indeed, it is unreasonable to conclude otherwise, as the majority has done, that the framers and adopters *did not* intend the Bill of Rights to protect the right to vote—the fundamental means by which the people participate in a representative democracy.

In essence, the majority paradoxically holds that section 2 guarantees the people's sovereign right to participate in government but that this guarantee applies only if section 2 specifically identifies (enumerates) the mechanism in which the right to participate in government can be exercised. Of course, section 2 does not enumerate any specific mechanisms in which the people can exercise their sovereign right to participate in government. Thus, the majority's holding renders section 2 of our Kansas Constitution Bill of Rights meaningless.

Despite the magnitude of this decision—which can be broadly read to reject the principle that rights can be implicitly protected by the Kansas Constitution—the majority's underlying legal analysis is minimal:

- Section 2 is limited to a general declaration of the people delegating their power to government;

77

- the Kansas Constitution "contemplates" various mechanisms through which the people can delegate their power (popular elections [voting], limited elections [voting], appointments, and succession); and

- section 2 does not specifically "address" these mechanisms (voting, appointment, and succession) so the court must look instead to the specific provisions in articles 4 and 5. See slip op. at 1-2, Syl. ¶¶ 3-6.

Although made in the context of section 2, the reasoning underlying the majority's unprecedented decision refusing to recognize unenumerated constitutional rights plainly casts doubt on prior (and future) decisions of this court recognizing them in other provisions of the Kansas Constitution. See *Hodes*, 309 Kan. at 646 ("At the core of the natural rights of liberty and the pursuit of happiness is the right of personal autonomy, which includes the ability to control one's own body, to assert bodily integrity, and to exercise self-determination"—enabling decisions "that affect one's physical health, family formation, and family life."); *State v. Calderon*, 270 Kan. 241, 245, 13 P.3d 871 (2000) (a defendant's constitutional right to be present includes an implicit right to have trial proceedings translated); *Saucedo v. Winger*, 252 Kan. 718, 729, 850 P.2d 908 (1993) (implicit in the constitutional right to a civil trial is the right to a fair trial); *State v. Cunningham*, 222 Kan. 704, 706, 567 P.2d 879 (1977) (implicit in section 10 of the Kansas Constitution Bill of Rights is not only the right to representation by competent counsel, but also the right to self-representation); *Wilson v. Kansas Children's Home and Service League*, 159 Kan. 325, 328, 154 P.2d 137 (1944) (recognizing natural right of parents to custody of their minor children); *Babb v. Rose*, 156 Kan. 587, 589, 134 P.2d 655 (1943) (recognizing natural right of persons to hold and manage property and that statutes in derogation of these natural rights are to be strictly construed); *Lemons v. Noller*, 144 Kan. 813, 828, 63 P.2d 177 (1936) (constitutional right to vote in secret is implied from provision requiring elections by ballot); *Coffeyville Vitrified Brick & Tile Co. v. Perry*, 69 Kan. 297, 301, 76 P. 848 (1904) (constitutional right of employer to

discharge employee implicit with constitutional property rights); *State v. Bohan,* 19 Kan. 28, 31, 1877 WL 963 (1877) (law of self-defense founded upon the natural right of every man to protect his own life against unlawful assault).

These decisions recognize the framers' and adopters' intent to protect from government infringement not only specific enumerated rights, but those unenumerated rights inherent in the broader declarations of our Bill of Rights. As this court declared just 25 years after the Kansas Constitution was adopted by the voters:

> "The bill of rights is something more than a mere collection of glittering generalities: some of its sections are clear, precise and definite limitations on the powers of the legislature and all other officers and agencies of the state . . . *while others are largely in the nature of general affirmations of political truths, yet all are binding on legislatures and courts, and no act of the legislature can be upheld which conflicts with their provisions, or trenches upon the political truths which they affirm*." (Emphasis added.) *Atchison Street Rly. Co. v. Mo. Pac. Ry. Co.*, 31 Kan. 660, Syl. ¶ 1, 3 P. 284 (1884).

In other words, the framers and adopters of the Kansas Constitution deliberately chose to express general affirmations of political truths to protect individual rights from government intrusion rather than exhaustively enumerate specific rights.

To conclude otherwise would render many sections in our Bill of Rights null and void, an absurd result. A categorical denial of constitutional protection for unenumerated rights not only defies our rules of construction, but it also contradicts the plain language of section 20, which states:

> "§ 20. Powers retained by people. This enumeration of rights shall not be construed to impair or deny others retained by the people; and all powers not herein delegated remain with the people." Kan. Const. Bill of Rights, § 20.

79

By wrapping up the previous 19 sections of the Bill of Rights with this section, the framers and adopters conveyed their intent to protect both enumerated and unenumerated rights retained by the people not otherwise specifically ("herein") delegated. This relationship between the power of the people and that of the government is explained in *Wright v. Noell*, 16 Kan. 601, 603, 1876 WL 1081 (1876):

> "'All political power is inherent in the people,' and all powers not delegated by the constitution remain with them. These truths, which lie at the foundation of all republican governments, are distinctly asserted in our own bill of rights, §§ 2 and 20. By the constitution the people have granted certain powers, and to that extent have restricted and limited their own action. But beyond those restrictions, and except as to matters guarded by absolute justice, and the inherent rights of the individual, the power of the people is unlimited."

The framers' and adopters' rationale for protecting both enumerated and unenumerated rights from government intrusion was rooted in a profound understanding of the delicate balance between government authority and individual liberties. By articulating broad principles and fundamental values, such as "life, liberty, and the pursuit of happiness" and "[a]ll political power is inherent in the people [upon which] all free governments are founded," they allowed for flexibility over time. See Kan. Const. Bill of Rights, §§ 1, 2. These principles could adapt to changing circumstances and evolving societal norms without requiring constant amendments. The Constitution became a living document, capable of addressing unforeseen challenges. Enumerating every right explicitly would have been impractical and limiting. The framers recognized that new rights might emerge, and rigid lists could inadvertently exclude essential protections. Instead, they chose a principled framework that could accommodate both existing and future rights. And general affirmations acted as a check on government authority. By emphasizing principles like limited government, separation of powers, and checks and balances, they aimed to prevent any single branch from becoming tyrannical. These

80

principles indirectly protected individual rights. In essence, the framers sought a delicate equilibrium:  acknowledging fundamental truths while allowing room for interpretation and growth. Their wisdom lies in creating a framework that endures while respecting the adaptability of human rights and governance.

The majority's decision, in stark contrast to the original intent of the Constitution's drafters, undermines the very principles on which our foundational document was crafted. Instead, the majority's decision supports the rationale that recently led the current United States Supreme Court to hold there is no longer a federal constitutional right to abortion, overturning decades of precedent. See *Dobbs v. Jackson Women's Health Organization*, 597 U.S. 215, 231, 142 S. Ct. 2228, 213 L. Ed. 2d 545 (2022) ("The Constitution makes no reference to abortion, and no such right is implicitly protected by any constitutional provision, including the one on which the defenders of *Roe* and *Casey* now chiefly rely—the Due Process Clause of the Fourteenth Amendment."). By discarding almost 50 years of precedent, the *Dobbs* decision jeopardizes not only the right to abortion but also the right to access contraception, the right to interracial marriage, and the right to marriage equality—all of which were previously held by the Court to be unenumerated privacy rights under the United States Constitution. Like the decision in *Dobbs*, the majority's decision here to reject the principle that rights can be implicitly protected by the Kansas Constitution Bill of Rights places the stability of our legal framework in jeopardy. The deeply troubling consequences of the majority's decision cannot be overstated.

In short, had the majority followed the well-established rules of constitutional construction, it could not reasonably have concluded that section 2 is limited to a general principle of delegated political power. To arrive at its conclusion, the majority had to ignore these rules and did so in the following ways:

- It failed to reasonably construe section 2 to give effect to the intent of the framers and adopters;

- It applied a technical interpretation of the exact words employed rather than accounting for the attendant circumstances existing when the framers adopted section 2;

- It defeated the obvious intent of the framers and adopters when another construction consistent with the words and the purpose of section 2 could be adopted to enforce and carry out the drafters' intent;

- It construed section 2 to defeat its evident purpose rather than considering how the language used would function in practical situations to suppress the mischief at which the law was aimed; and

- It construed section 2 as a "glittering generality" conferring no substantive rights, which necessarily means there are no rights within this provision to prevent the Legislature or the courts from infringing.

## 1.2. *Kansas Constitution's structure and ordering*

The conclusion that the framers and adopters intended to substantively protect the right to vote in section 2 is bolstered by the Kansas Constitution's unique structure and ordering. Our Constitution does not begin with an enumeration of the powers of government. Rather, it leads with a Bill of Rights which affirmatively grants substantive, individual rights to the people of Kansas such as freedom of speech, religious liberty, speedy trial, and due process. Chief among these are the inalienable natural rights under section 1, and the right of the people to exercise their inherent political power under section 2. To hold that the right to vote is not included among these essential rights secured at the forefront of our founding documents is simply incomprehensible. But if

there is any doubt that the right to vote is protected, I reiterate that section 20, the closing provision of the original Bill of Rights, puts that to rest by making clear that the list of enumerated rights is not the universe of rights possessed by the people. Again, the majority ignores section 20's mandate today by its holding and, by extension, calls into question all unenumerated rights implied by our Constitution.

It is only after presenting the Bill of Rights that the Kansas Constitution proceeds to the Articles which delegate limited powers to the three branches of government. Unlike the Bill of Rights, the Articles do not *grant* any rights; instead, they establish the roles and functions of the three branches. To that end, the Articles expressly define the scope of each branch's power, ensuring a check-and-balance system and separation of powers framework, and restricting the extent to which government can impose on individual rights protected under the Bill of Rights. By organizing the Kansas Constitution in this way, the framers and adopters prioritized the guarantee and protections of these rights. See *Hodes*, 309 Kan. at 660-61 ("By this ordering, demonstrating the supremacy placed on the rights of individuals, preservation of these . . . rights is given precedence over the establishment of government.").

Given the obvious purpose and scope of the Articles to set clear limits on the branches of government, it is particularly strange that the majority has found the right to vote is *only* protected under the Articles. Granted, article 5 covers "Suffrage," but the superficial logic ends there since this provision tells us only how the government can infringe upon the right to vote and does not affirmatively provide for the right itself.

1.3. *Kansas Supreme Court precedent*

Kansas Supreme Court precedent also reinforces the conclusion that the framers and adopters of the Kansas Constitution intended section 2 to substantively protect the people's right to vote. As Justice Rosen rightly points out, this court has interpreted the

Bill of Rights for over 100 years as being a judicially enforceable document, not a mere "declaration" as the majority holds today. Slip op. at 51 (quoting *Atchison Street Rly. Co.*, 31 Kan. 660, Syl. ¶ 1).

Justice Rosen also cites to *Harris v. Shanahan*, which held the individual right to vote is inherent in the republican form of government created by the state Constitution and specifically protected under sections 1 and 2:

> "Within the express and implied provisions of the Constitution of Kansas every qualified elector of the several counties is given the right to vote for officers that are elected by the people, and he is possessed of equal power and influence in the making of laws which govern him. (Bill of Rights, Kansas Constitution, Sections 1, 2.)." 192 Kan. at 204.

Less than a decade later in *Moore v. Shanahan*, this court reaffirmed *Harris* and the robust constitutional protections of the right to vote as implicit in popular sovereignty:

> "The right to vote in any election is a personal and individual right, to be exercised in a free and unimpaired manner, in accordance with our Constitution and laws. The right is pervasive of other basic civil and political rights, and is the bed-rock of our free political system. Likewise, it is the right of every elector to vote on amendments to our Constitution in accordance with its provisions. This right is a right, not of force, but of sovereignty. It is every elector's portion of sovereign power to vote on questions submitted. Since the right of suffrage is a fundamental matter, any alleged restriction or infringement of that right strikes at the heart of orderly constitutional government, and must be carefully and meticulously scrutinized." 207 Kan. at 649.

The *Moore* court emphasized that the right to vote under the Kansas Constitution is fundamental and pervasive, that protecting this right is crucial because it forms the

bedrock of our free political system, and that any alleged restriction or infringement on the right to vote strikes at the heart of orderly constitutional government. Today, without even an explanation, the majority overturns this precedent.

### 1.4. *Conclusion*

The majority performs no part of the analysis necessary to faithfully construe section 2 before eliminating—forever—section 2 as a source of *any* substantive political rights. First, the majority fails to construe section 2's language to give effect to the framers' and adopters' intent to provide such protection. Second, the majority disregards the distinction between the Bill of Rights, which affirmatively grants individual rights, and the Articles, which delegate limited powers to government to restrict interference with individual rights protected under the Bill of Rights. Third, the majority ignores two lines of precedent established by this court: (1) section 2 protects the substantive *implied* right to vote and (2) the Kansas Constitution protects unenumerated rights. In sum, the majority's interpretation of section 2—and its path for getting there—undermines the framers' and adopters' intent, is irreconcilable with this court's historical interpretation of section 2, and is completely contrary to a republican form of government.

## 2. *Reframing plaintiffs' section 2 claim without prior notice*

The plaintiffs have alleged at every stage of this litigation that the challenged laws violate the substantive right to vote protected in section 2. In a vigorous exercise of mental gymnastics, the majority arbitrarily converts plaintiffs' claims

> *from* ones alleging that the challenged laws infringe on their section 2 right to exercise sovereign power by voting

> *to* ones alleging that the challenged laws are unreasonable *mechanisms* under article 5 of choosing to whom they will delegate their sovereign powers.

The majority's unilateral decision to convert plaintiffs' claims is improper for several reasons. First, voting is not merely a procedural mechanism; it is the lifeblood of representative government. Second, I am confused about where exactly the majority stands on section 2 at this point. On the one hand, the majority could be doubling down on its holding that section 2 is merely a general declaration authorizing the people to delegate their power to government. On the other hand, the majority could be stating an alternative holding:  section 2 *does* confer a substantive right to vote as an exercise of sovereign power but, as reframed by the majority, plaintiffs fail to state an actionable claim alleging the challenged laws infringe on that right. If it is the former, I have already explained why the majority's interpretation conflicts with the framers' intent and is irreconcilable with this court's historical interpretation of section 2.

But if it is the latter, problems arise. For example, the majority reframes plaintiffs' section 2 claims to article 5 claims without prior notice or opportunity for the litigants to brief the issue as the majority has modified them. This lack of fair notice undermines the principles of procedural due process and fairness. The adversarial process relies on both parties presenting their arguments and evidence within an established framework. When the court unilaterally restructures the issue, it disrupts this process. The court's role is to facilitate a fair contest between opposing sides, not to unilaterally redefine the dispute. The parties briefed and argued the section 2 substantive-rights issue at the district court, the Court of Appeals, and before this court. Deviating from the agreed-upon issue presented harms the integrity of the litigation and significantly departs from established legal norms.

Moreover, litigants have a right to a fair and impartial hearing, including consideration of all relevant legal arguments. The court's failure to decide a constitutional issue leaves the litigant without a resolution, which may result in the litigant being unable to assert that right effectively in future cases through a procedural barrier. Relevant here,

86

plaintiffs face the possibility on remand that they will not prevail on their claimed violations of the right to vote under section 2 (equal protection), section 18 (due process), and article 5 (suffrage). If that happens, what exactly is the status of their section 2 claim? Has it been resolved on the merits under these facts, creating a procedural bar to future litigation of their section 2 claim? More broadly, does it create a procedural bar for others to litigate a section 2 claim under similar facts? Under the legal standard created by the majority, how does a plaintiff allege a section 2 substantive voting rights claim upon which relief can be granted?

As the questions above demonstrate, an unresolved constitutional issue properly presented for decision can detrimentally impact a litigant's rights and create uncertainty for other litigants facing similar issues. It also creates uncertainty for the district courts and the courts of appeal, who may struggle to apply consistent legal standards. When courts avoid deciding critical constitutional questions, it erodes public trust and litigants may lose confidence in the legal system's ability to safeguard their rights, undermining the legitimacy of the judiciary.

My confusion about the majority's position on section 2 aside, I am perplexed by the majority's decision to reframe the issue at all. As reframed, the issue presented is whether the challenged laws are unreasonable mechanisms under article 5 that infringe on the right to choose a representative to whom a person will delegate sovereign powers. But as noted by the majority at the outset of the opinion, plaintiffs already claim the challenged laws violate the right to vote under article 5. So reframing plaintiffs' section 2 claim not only (potentially) leaves that claim unaddressed, but the analysis is duplicative of what the majority would have had to conduct anyway.

*3. The right to vote under article 5 and the* Butts *test*

Remember, the majority holds that only expressly enumerated rights in section 2 are protected, and voting (or the mechanism of voting) is not an expressly enumerated right in section 2. Yet the majority finds voting *is* an expressly enumerated right in article 5 of the Kansas Constitution and, as such, is entitled to the "strongest possible constitutional protections." See slip op. at 2, Syl. ¶ 7. To establish the enumerated right to vote protected by article 5 has been violated, the majority holds a plaintiff must show the challenged law imposes an "extra-constitutional qualification" to qualify as an elector as defined in section 1 of article 5. In presenting the factors for the court's consideration in this "extra-constitutional qualification" test, the majority relies on its interpretation of the holding in *State v. Butts*, 31 Kan. 537, 2 P. 618 (1884).

I agree article 5 protects the people's right to vote. But the majority's finding that the right to vote is an enumerated right in article 5 is demonstrably false. Moreover, the majority incorrectly states the test announced in *Butts* to determine when a state restriction on voting unconstitutionally burdens the right to vote under article 5.

3.1. *The right to vote is implied by article 5*

Having dispensed with our traditional rules of constitutional construction, the majority summarily finds the substantive right to vote in Kansas is one "expressly enumerated right," slip op. at 29, under the following language of article 5 of the Kansas Constitution:

> "§ 1. Qualifications of electors. Every citizen of the United States who has attained the age of eighteen years and who resides in the voting area in which he or she seeks to vote shall be deemed a qualified elector.

". . . .

"§ 4. Proof of right to vote. The legislature shall provide by law for proper proofs of the right of suffrage." Kan. Const. art. 5, §§ 1, 4.

I am confused. Despite thorough examination of these provisions, I find no express language conferring upon individuals the right to participate in the democratic process by casting their ballots. Section 1 precisely defines the qualifications of electors in terms of citizenship, age, and residency requirements. And section 4 requires the Legislature to create laws that establish appropriate methods for verifying a person's eligibility to participate in elections. Nowhere in these provisions is there detailed language expressly conferring the right to vote.

Yet one can easily construe an *implicit* (unenumerated) right to vote from both section 1's precisely defined qualifications of electors (citizenship, age, and residency requirements) and section 4's legislative responsibility to establish clear procedures for verifying an elector's qualifications. So why does the majority insist that article 5 states an expressly enumerated right to cast a ballot to vote when the language addresses only the qualifications of electors and the Legislature's duty to verify those qualifications? Because it is the only way the majority can distinguish (1) its decision that article 5 protects the right to vote as expressly enumerated from (2) its decision that section 2 of the Bill of Rights does not protect the right to vote because it is only implied. Thus, it may appear as if the majority is presenting a false narrative to reach a desired outcome.

I find one more issue addressed by the majority confusing in this section. In an apparent matter of first impression, the majority applies a rule of strict statutory interpretation—that a specific provision controls over a more general one—to constitutional construction. First, the majority compares the affirmative rights in section 2 of the Bill of Rights to the powers and limitations of government under article 5. Then,

the majority holds the "more specific[], concrete[], and plainly" appearing rights guaranteed by article 5 control over "the general statement of principle set forth in section 2 which does not—by its plain terms—address itself to voting." Slip op. at 27.

My confusion is two-fold. First, it appears (again) that the majority finds section 2 *does* protect every elector's portion of sovereign power to vote *but* the general nature of this protection yields to article 5 because the language there specifically addresses elections and the necessary qualifications of people who vote. Of course, if this is true, the majority's finding here contradicts its earlier findings that section 2 *does not* provide substantive protection for the right to vote.

My second point of confusion is a conclusion implied by the majority's finding: that when two separate but compatible constitutional provisions provide protection from government overreach, the provisions can never work together to complement each other. Instead, the court must limit protection to that afforded by the more specific protection and deny protections afforded by the more general provision. See slip op. at 26-27. If this is, in fact, a rule of law the majority intends to state as a matter of first impression, I strongly disagree with its adoption. Constitutional provisions can sometimes overlap, addressing similar rights from different angles. An example is *Griswold v. Connecticut*, 381 U.S. 479, 484-85, 85 S. Ct. 1678, 14 L. Ed. 2d 510 (1965). There, the United States Supreme Court held that the Connecticut law forbidding use of contraceptives unconstitutionally intrudes upon the inferred right of marital privacy within:

- The First Amendment's right of association.
- The Third Amendment's prohibition against quartering soldiers during peacetime without the owner's consent.
- The Fourth Amendment's safeguards against unreasonable searches and seizures.
- The Fifth Amendment's safeguards against self-incrimination.

90

- The Ninth Amendment's safeguards protecting unenumerated rights.
- The Fourth and Fifth Amendment's protection of privacy as a fundamental right.

Here, the majority confines its analysis to pitting the individual political rights granted in section 2 against the State's interest in conducting elections in article 4 and the qualifications of electors in article 5. The majority fails to analyze the scope or interplay between these two constitutional provisions. Without such an analysis, the majority's claim that the right to vote is controlled by article 5 to the exclusion of section 2 lacks any factual or logical foundation.

### 3.2 *The* Butts *test*

Section 1 of article 5 of the Kansas Constitution provides: "Every citizen of the United States who has attained the age of eighteen years and who resides in the voting area in which he or she seeks to vote shall be deemed a qualified elector."

Section 4 of article 5 directs the Legislature to "provide by law for proper proofs of the right of suffrage."

The majority holds these provisions substantively protect the people's right to vote and the test to determine whether this right has been violated was set forth almost 140 years ago in *Butts*. Here is how the majority describes the *Butts* test:

> "[T]he test pronounced in *Butts* provides that the Legislature may validly make registration (or the provision of other 'proper proofs') a prerequisite to the act of voting, but in so doing, the Legislature cannot 'under the pretext of securing evidence of voters' qualifications . . . cast so much burden as really to be imposing additional qualifications' on the right to suffrage. 31 Kan. at 554. Accordingly, to prevail on a claim that the article 5 right to suffrage has been violated, a plaintiff must show that the Legislature has

91

imposed what amounts to a new, extra-constitutional qualification on the right to be an elector—that is, the law must be shown to unreasonably burden the right to suffrage. Such unreasonable burdens, as a matter of law, bear no reasonable relationship to the Legislature's lawful role of providing proper proofs but instead amount to extra-constitutional and de facto qualifications on the right to suffrage. If a law is shown to violate the *Butts* test—i.e., if it imposes any additional de facto qualifications not expressly set forth in article 5 on the right to become an elector—the law is unconstitutional." Slip op. at 30-31.

Once again, I admit to confusion, this time in understanding the elements of the *Butts* test as construed by the majority. So I broke the paragraph down into component parts to figure it out.

To prevail on a claim that the article 5 right to suffrage has been violated:

- The plaintiff must show that the challenged law imposes a new, extra-constitutional qualification on the right to be an elector beyond that precisely defined in section 1 (identity, citizenship, age, and residency).

- A law that imposes a new, extra-constitutional qualification on the right to be an elector beyond that precisely defined in section 1 (identity, citizenship, age, and residency) unreasonably burdens the right to suffrage.

- A law that unreasonably burdens the right to suffrage, as a matter of law, bears no reasonable relationship to the Legislature's lawful role of providing proper proofs but instead amounts to extra-constitutional and de facto qualifications on the right to suffrage.

92

- A law that imposes any additional de facto qualifications not expressly set forth in section 1 (identity, citizenship, age, and residency) is unconstitutional.

Condensed to its component parts, the majority's rather complicated interpretation of *Butts* boils down to the following test: A challenged law violates the article 5 right to vote only when it imposes a new, extra-constitutional qualification for electors that bears no reasonable relationship to a demand for proper proof of identity, citizenship, age, and residency.

With all due respect, the majority inaccurately interprets the test as expressed by the *Butts* court. The majority's bright-line test considering only the reasonableness of a challenged law as it relates to proof of identity, citizenship, age, and residency is not supported by the court's analysis in *Butts*. Instead of a bright-line test, *Butts* requires courts to employ a balancing test to weigh the degree to which the challenged law burdens the constitutional right to vote against the Legislature's responsibility to ensure qualification of an elector through proper proofs. See 31 Kan. at 554. Let me explain.

The law challenged in *Butts* required annual registration to vote, in person, at the city clerk's office at least 10 days before an election. The plaintiffs alleged this law placed an additional qualification on the right to vote. The court disagreed, finding the law was a reasonable provision to ascertain beforehand, by proper proofs, who should be entitled to vote on the day of election. The court compared the registration obligations in the challenged law to obligations requiring a voter to go to a specific place to vote, to provide an oath if the right to vote is challenged, or to provide naturalization papers upon request. Thus, the court ultimately held the annual registration to vote, in person, at the city clerk's office at least 10 days before an election did not impose an additional qualification on the right to vote. 31 Kan. at 554. So far, this tracks the majority's interpretation of the test.

93

Significantly, however, the *Butts* court went on to specifically contemplate unduly burdensome registration requirements that it *would* construe to impose additional qualifications on the right to vote. See 31 Kan. at 554 ("Doubtless, under the pretense of registration and under the pretext of securing evidence of voters' qualifications, laws might be framed which would cast so much burden as really to be imposing additional qualifications."). As an example, the court contemplated a law that required annual voter registration for all Kansans on January 1 at the state capitol in Topeka. Acknowledging this registration requirement similarly would have been intended to ascertain beforehand, by proper proofs, who should be entitled to vote on the day of election, the court indicated this particular requirement would cast so much burden as really to be imposing additional qualifications. 31 Kan. at 554-55 ("The legislature cannot, by, in form, legislating concerning rules of evidence, in fact, overthrow constitutional provisions.").

The analysis in *Butts* reflects a balance between the importance of reasonable voter registration processes while ensuring the processes do not unduly restrict voting rights. See 31 Kan. at 555 ("But where ample facilities for registering are furnished, and the opportunities for registering are continued down to within a reasonable time of the election day, then it cannot be said that mere rules of evidence are abused."). The majority's bright-line test considering only the reasonableness of a challenged law as it relates to proof of identity, citizenship, age, and residency disregards the *Butts* balancing test, which weighs the degree to which the challenged law burdens the constitutional right to vote against the Legislature's responsibility to ensure proper proofs. To construe *Butts* as the majority does—as a test to determine whether a challenged law simply bears a reasonable relationship to the proper proofs of identity, citizenship, age, and residency— is to construe the Legislature's authority to demand proper proofs as unlimited in scope without any consideration of the burden this demand would create on casting a ballot. As an example, compare:

94

- a law requiring annual registration to vote, in person, at the city clerk's office at least 10 days before an election to

- a law requiring biannual registration to vote, in person, at the state capitol at least 100 days before an election.

Under the majority's erroneous interpretation of *Butts*, the two versions of the law cited above either bear a reasonable relationship to the proper proofs of identity, citizenship, age, and residency or they do not. In either case, the burden on the right to vote that may be caused by the second option is irrelevant. Of course, the hypothetical I pose is indistinguishable from the one contemplated in *Butts*, which the court described as a law framed "under the pretense of registration and under the pretext of securing evidence of voters' qualifications" but "cast so much burden as really to be imposing additional qualifications." 31 Kan. at 554.

Although *Butts* adopted a balancing test, it did not address the standard of review courts should apply in weighing the competing interests, likely because the case was decided before the strict scrutiny, intermediate scrutiny, and rational basis standards were developed as a way to evaluate the constitutionality of a law. But the right to vote has long been considered a fundamental right under the United States Constitution. See *Burdick v. Takushi*, 504 U.S. 428, 433, 112 S. Ct. 2059, 119 L. Ed. 2d 245 (1992) ("It is beyond cavil that 'voting is of the most fundamental significance under our constitutional structure.'") (quoting *Illinois Bd. of Elections v. Socialist Workers Party*, 440 U.S. 173, 184, 99 S. Ct. 983, 59 L. Ed. 2d 230 [1979]); *Reynolds v. Sims*, 377 U.S. 533, 561-62, 84 S. Ct. 1362, 12 L. Ed. 2d 506 (1964); *Yick Wo v. Hopkins*, 118 U.S. 356, 370, 6 S. Ct. 1064, 30 L. Ed. 220 (1886). And voting is considered a fundamental right under the Kansas Constitution as well. See *Hodes*, 309 Kan. at 657 ("The Kansas Constitution initially denied women the right to vote in most elections, to serve on juries, and to exercise other rights that we now consider fundamental to all citizens of our state.");

*Provance v. Shawnee Mission U.S.D. No. 512*, 231 Kan. 636, 641, 648 P.2d 710 (1982) ("the right to vote for elected representatives is fundamental 'because statutes distributing the franchise constitute the foundation of our representative society'"); *Moore*, 207 Kan. at 649 ("the right of suffrage is a fundamental matter").

As a fundamental right, this court has held government restrictions on voting are subject to the highest level of judicial review to determine whether they further the government's identified compelling interest and are narrowly tailored to that end. *Moore*, 207 Kan. at 649 ("Since the right of suffrage is a fundamental matter, any alleged restriction or infringement of that right strikes at the heart of orderly constitutional government, and must be carefully and meticulously scrutinized."); see also *State v. Ryce*, 303 Kan. 899, 948, 957, 368 P.3d 342 (2016), *aff'd on reh'g* 306 Kan. 682, 396 P.3d 711 (2017) ("The highest level of scrutiny, 'strict scrutiny,' applies to judicial review of statutes implicating fundamental rights guaranteed by the Constitution."); *State v. Risjord*, 249 Kan. 497, 501, 819 P.2d 638 (1991) (same); *Farley v. Engelken*, 241 Kan. 663, 669, 740 P.2d 1058 (1987) (same). Thus, whether substantive violations under section 2, equal protection violations under section 2, due process violations under section 18, or substantive violations under article 5, the plaintiffs' claims alleging violation of their fundamental right to vote are subject to strict scrutiny, even under *Butts*.

In sum, the majority's misinterpretation of *Butts* is not merely a fundamental error isolated to this case; it has far-reaching implications for voting rights and the democratic process. Combined with the majority's broader decision weakening the constitutional rights of Kansans under the Bill of Rights, today's decision could alter fair elections and deprive the people of their right to participate in the political process for the foreseeable future.